Filed 8/2/16  P. v. Shah CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAY C. SHAH et al.<br><br>    Defendants and Appellants. | A138475<br><br>(San Francisco City and County<br>Super. Ct. Nos. 214617, 214619)<br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>CHANGE IN JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on July 8, 2016, be modified as follows:

On page 74, under the heading "**DISPOSITION**" delete remaining paragraphs **after** the first full paragraph, and replace them with the following:

> The sentence imposed under the section 12022.6, subdivision (a)(2), enhancement for count 11 is stayed pursuant to section 654. Shah's sentence shall be reduced by eight months.

> Accordingly, Shah's sentence shall be reduced by a total of 24 months.

> The section 12022.6, subdivision (a)(2), enhancement on count 14 is stricken.  Lum's sentence shall be reduced by eight months.

1

In all other respects, the judgment is affirmed.

This modification changes the judgment.

Appellant Shah's petition for rehearing is denied.

Dated: _____ _____

Kline, P.J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAY C. SHAH et al.<br><br>        Defendants and Appellants. | A138475<br><br>(San Francisco City and County Super. Ct. Nos. 214617, 214619) |

Jay Shah and Winston Lum appeal from convictions arising from fraudulent transactions in which three luxury condominiums in San Francisco owned by Shirley Hwang were put into Lum's name and used to obtain loans of over $2 million.  Shah was convicted of conspiracy to commit money laundering, identity theft, grand theft, money laundering, burglary, and filing false deeds and deeds of trust; Lum was convicted of grand theft, attempted grand theft, filing a false deed and filing false deeds of trust.  The gist of appellants' defenses at trial was that they were unwitting participants in a fraudulent scheme orchestrated by one Kaushal Niroula and others.

Shah contends his federal due process rights were violated by a 27-day recess taken during jury deliberations; the trial court erred in two of its evidentiary rulings; the burglary conviction was based on an invalid legal theory; various enhancements were improperly imposed; and imposition of a $14 million restitution fine violated his Sixth Amendment right to a jury trial.

1

Lum contends the trial court erred in excluding certain evidence, and the evidence was insufficient to support his conviction for attempted grand theft and accompanying enhancement for causing a loss exceeding $200,000.[1]

We conclude that several of the sentencing enhancements were improperly imposed and in all other respects affirm the judgment.

## STATEMENT OF THE CASE

The initial information in this case was filed on February 22, 2011, charging appellants, Melvin Emerich, Grachelle Languban, and Kaushal Niroula with various offenses. The charges prosecuted at trial were stated in the second amended information, filed on April 3, 2012, as follows:

Count 1 (all defendants): Conspiracy (Pen. Code, § 182, subd. (a)(1))[2] between September 1, 2008, and March 15, 2010, to commit grand theft (§ 487, subd. (a)), filing false deeds (§ 115, subd. (a)) and money laundering (§ 186.10, subd. (a)). It was alleged that the defendants took property of a value exceeding $3,200,000 (§12022.6, subd. (a)(4)); the offense was committed in several jurisdictions (§ 781); and Lum and Niroula committed the offense while on bail (§ 12022.1).

Count 2 (all except Emerich): Grand theft of real property belonging to Shirley Hwang (§ 487, subd. (a)), with enhancements as alleged in count 1.[3]

Count 3 (all except Emerich): Identity theft of information belonging to Shirley Hwang (§ 530.5, subd. (a)), with enhancements as alleged in counts 1 and 2.

Count 4 (all except Emerich): Filing a false or forged grant deed to 425 First Street, unit 5501, San Francisco. (§ 115, subd. (a).) The above-described multi-jurisdiction and on-bail enhancements were alleged, as well as that the defendants had taken property of a value exceeding $1,300,000 (§ 12022.6, subd. (a)(3)) and caused a financial loss greater than $100,000 (§ 115, subd. (c)(2)).

---

[1] Lum also joins in Shah's arguments "insofar as they may be beneficial to him."

[2] Further statutory references are to the Penal Code unless otherwise indicated.

[3] This count was dismissed during trial on appellants' motion for judgment of acquittal. (§ 1118.1.)

Count 5 (all except Emerich): Filing a false or forged grant deed to 425 First Street, unit 4802, San Francisco. (§ 115, subd. (a).) In addition to the multi-jurisdiction and on-bail enhancements, it was alleged that the defendants had taken property of a value exceeding $200,000 (§ 12022.6, subd. (a)(2)) and caused a financial loss greater than $100,000 (§ 115, subd. (c)(2).)

Count 6 (all defendants except Emerich): Filing a false or forged grant deed to 425 First Street, unit 4902, San Francisco (§ 115, subd. (a)), with the enhancements alleged in count 5.

Count 7 (all except Languban): Grand theft of currency belonging to DeWitte Mortgage and Kitco Holdings. (§ 487, subd. (a).) A taking of property worth more than $1,300,000 was alleged (§ 12022.6, subd. (a)(3)), as well as the above-described multi-jurisdiction and on-bail enhancements.

Count 8 (all defendants): Filing a false or forged deed of trust to 425 First Street, unit 5501, San Francisco (§ 115, subd. (a)(1)), with the enhancements alleged in count 4.

Count 9 (all except Languban): Filing a false or forged deed of trust to 425 First Street, unit 4802, San Francisco (§ 115, subd. (a)(1)), with the enhancements alleged in count 5.

Count 10 (all except Languban): Filing a false or forged deed of trust to 425 First Street, unit 4902, San Francisco (§ 115, subd. (a)(1)), with the enhancements alleged in count 5.

Count 11 (all except Languban): Money laundering on March 6, 2009. (§186.10.) The same multi-jurisdiction and on-bail enhancements were alleged, as well as a taking of more than $200,000. (§ 12022.6, subd. (a)(2).)

Count 12 (all except Languban): Money laundering on March 9, 2009 (§186.10), with the enhancements alleged in count 11.

Count 13 (all except Languban): Money laundering on April 20, 2009. (§186.10), with the enhancements alleged in count 11.

Count 14 (Lum only):  Attempted grand theft of currency and personal property from John Abd-El-Malek.  (§§ 664, 487, subd. (a).)  The on-bail enhancement was alleged, as well as a taking of more than $200,000.  (§ 12022.6, subd. (a)(2).)

Count 15 (Lum only):  Filing a false quitclaim deed to 425 First Street, unit 4802, San Francisco, dated January 12, 2010 (§ 115, subd. (a)), with the on-bail enhancement allegation and an allegation that Lum caused a financial loss greater than $100,000 (§ 115, subd. (c).)

Count 16 (Lum only):  Misdemeanor fraudulent conveyance to Corinn Rankin of the quitclaim deed described in count 15.  (§ 531.)

Count 17 (Lum only):  Misdemeanor fraudulent conveyance to Corinn Rankin of the quitclaim deed described in count 15.  (§ 531a.)

Count 18 (Niroula, Shah, Lum):  First degree burglary (entry into residence of Shirley Hwang and Michael Shigezane with intent to commit grand theft, filing false deeds and money laundering).  (§ 459.)  It was alleged that the offense was a serious/violent felony (§§ 1192.7, subd. (c), 667.5, subd. (c)(21)).  The multi-jurisdiction and on-bail enhancements were alleged, as well as a taking of property exceeding $3,200,000 (§ 12022.6, subd. (a)(4)).[4]

It was further alleged that all the defendants had engaged in a pattern of white collar crime involving the taking, or resulting in the loss, of more than $500,000 (§ 186.11, subd. (a)(2)) and had committed a theft of more than $100,000 (§1203.045, subd. (a)), and that the cumulative value of the money laundering transactions was more than $1,000,000 but less than $2,500,000 (§ 186.10, subd. (c)).

Shah, Lum, and Emerich proceeded to jury trial beginning in March 2012, with opening statements presented on April 18, 2012.  Languban had skipped bail and fled to

---

[4] Counts 19 through 27 were alleged against Languban only.

the Philippines, and Niroula's case had been severed as he was being held in Riverside County pending trial for murder.[5]

The jury began deliberations on July 9, 2012. On July 24, the jurors were dismissed until August 20. They resumed deliberations on that date, and returned their verdicts on September 19.

Shah was found guilty as charged (counts 1, 3-13, 18); the excessive taking enhancement allegations were found true, as were the special findings under sections 186.10, subdivision (c), 186.11, subdivision (a)(2), and 1203.045, subdivision (a). With respect to count 1, the jury found Shah took part only in a conspiracy to commit money laundering.

Lum was found guilty of grand theft as charged in count 7, filing false or forged instruments as charged in counts 8, 9, 10 (deeds of trust), and 15 (quitclaim deed to 4802), and attempted grand theft as charged in count 14, and the jury found true the excessive taking enhancement allegations and the special findings under section 1203.045 and 186.11, subdivision (a)(2). Lum was found not guilty of filing forged instruments (counts 4, 5, 6 (grant deeds)) and burglary (count 18), and a mistrial was declared as to him on counts 1, 3, 11, 12 and 13, and on the special allegation under section 186.10, subdivision (c).

On March 19, Shah was sentenced to a total prison term of 20 years and ordered to pay a fine of $14.10 million. Lum was sentenced to a total of 12 years and ordered to pay a fine of $4.4 million.

Shah filed a timely notice of appeal on March 28, 2013. Lum filed a timely notice of appeal on April 10, 2013.

## STATEMENT OF FACTS

In September 2008, Shirley Hwang owned three condominiums at One Rincon Hill, 425 First Street in San Francisco, having recently purchased units 4802 and 4902 for

---

[5] Niroula had been charged with the murder of Clifford Lambert in Palm Springs; his case and that of one of his codefendants, Daniel Garcia, had been severed from the case of attorney David Replogle, who had been convicted of the murder.

5

almost $1.4 million each and unit 5501, with partner Michael Shigezane, for $1.9 million. Hwang was living in unit 4802 and trying to sell unit 4902. She authorized Shigezane and her real estate agent, Morton Mah, to access the unit, and the keys were left at the front office for potential viewers. Just before Thanksgiving, Hwang took the unit off the market, planning to put it back on at the beginning of the new year.

In November 2008, real estate agent Kathy Chan went to pick up a rent check from attorney David Replogle, who was a tenant in a building she managed. As she was unable to find parking, Replogle sent someone down with the check. The young man identified himself as "Sid Jones"; when later shown a photographic lineup, Chan identified a photograph of Niroula. He asked Chan if she had anything to rent in the building. She did not, but contacted Shigenzane, a former client, and arranged for "ones to see Hwang's units.

Shigenzane showed Jones unit 5501; Jones was interested in renting it but did not follow through, then later expressed interest in purchasing unit 5501 and then in purchasing units 4902 and 4802 as well. Jones wanted to show the units to his uncle, Prashant Kahn, who was the decision-maker for a trust that would be financing the purchase. The keys to the units were left with security for Jones and his uncle, who were told to leave a letter of intent in unit 4802 for Shigenzane and Hwang. The letter of intent, dated February 13, 2009, promised $7.5 million for the three units. Chan had told Shigenzane that Jones had a bank account worth $100 million.

The phone number where Shigenzane called Jones's uncle, (415) 935-9646, belonged to an account in Shah's name for a "magicJack," a device that allows phone calls to be made over the internet through a computer. The physical address associated with the account, 504 Ross Drive, Sunnyvale, was that of a hotel owned by Shah's parents. Shah testified that he gave a device with this phone number to Niroula.

In early 2009, escrow agent Nga Tran was asked by Shah to run preliminary title reports on Hwang's Rincon condominiums. As of January 14, 2009, preliminary title reports from Old Republic Title Company showed title vested in Hwang. Tran told Shah that Hwang owned the condominiums "free and clear."

6

Shah asked Tran to prepare grant deeds from Hwang to Winston Lum for the three condominiums, saying that Hwang was Lum's aunt and that loans were going to be taken out on these properties in Lum's name, and Tran prepared the deeds on January 14, 2009. Shown the deed for unit 5501, Tran testified that she did not fill in the location of the property or the transfer tax number, and that the deed she prepared was not signed or notarized because Shah wanted to have it notarized and recorded "outside our transaction." Tran thought this was "weird"; she told Shah it would be best to have her notarize and record the deed because otherwise she would have to get an affidavit from Hwang confirming the transaction before the title company would insure it and she could close escrow, but Shah did not take her advice.

Grant deeds transferring title to each of Hwang's three condominiums from Hwang to Lum were recorded on January 16, 2009. Each bore a signature over the printed name "Shirley S. Hwang" that Hwang testified was not her signature. Each reflected having been notarized by Grachelle Languban,[6] whom Hwang testified she had never met. No title company was indicated on the deeds. Languban also notarized an affidavit concerning the properties that was purportedly from Hwang but Hwang testified she did not sign.

Tran had the preliminary title reports updated to reflect the recorded deeds transferring title from Hwang to Lum. The amended title report from Old Republic stated that the deeds were recorded "unsecure," meaning it would be necessary to get either an affidavit from Hwang saying she signed the grant deeds, or new grant deeds signed by Hwang.

---

[6] When interviewed by the police about the grant deed for unit 5501, Languban said she did not remember the transaction; asked for the relevant notary book, she said it had been destroyed. Notaries are required to notify the Secretary of State if a notary book is lost or destroyed. Languban had not reported this book lost or stolen, as she had with an earlier notary book, and she had never reported a notary book destroyed.

Subsequently, when the CFO of the loan company asked Languban about the documents, she first told him she had no information because the pages of her notary book had been torn out, then later in the conversation said the book had been stolen.

Tran met Niroula when Shah brought him to her office to have a document notarized. She identified Niroula in a photographic lineup the police showed her.

Mortgage Broker John Flores testified that in late 2008, Shah asked him about doing a loan on a condominium at 425 1st Street in San Francisco for someone who was out of the country. The loan was to be from a private lender, California Coastal Funding (CCF), and was to be a "cash-out" (meaning there was enough equity in the property to take cash out immediately) and "stated income" loan (meaning the lender did not require income documentation). Most of the information on the application was provided by Shah; Flores also spoke on the telephone with "Joshua Beam," an interpreter for the borrower, Winston Lum. Beam was in fact Niroula. Flores never met Lum, whom he understood did not speak English. Lum's employment was stated on the application as "Emperors of China," which Flores was told was a restaurant owned by Lum's family and actually called "Empress of China," and teaching tennis. Flores was told that Lum had monthly income of $32,000 from this employment and rental on the condominiums. Flores testified that he attempted to verify Lum's income but was not able to do so; he also testified that he did not try to verify Lum's income and assets because it was not required.

Flores was told that Lum's attorney was Replogle. He verified that Replogle was an attorney in good standing, and spoke with him approximately three times, which gave Flores "a certain comfort level" that the loan would in fact close.

Flores sent the loan application to Theo Hansen at CCF, who then on occasion asked Flores for help getting needed information. Flores received a letter, purporting to be from Lum, stating that Lum owned a tennis school and had accounts at Bank of America with deposits of approximately $50,000, and that the rest of his family money and assets were in Hong Kong. It was Flores's understanding that CCF wanted to use their own title company in San Diego rather than Tran to handle the escrow.

Robert Purdon, the former CFO of CCF, recalled that Flores referred Lum's loan application, and that Lum wanted the money to help a relative. Purdon listened in on a telephone conversation between one of his employees and Lum, in which Lum was not

8

able to fully answer everything and talked to Beam on the side.  Lum said he understood English but could not speak it well.  Subsequent communications about the loan were with Beam, and Purdon also spoke with Replogle, whom he contacted by calling (415) 935-9646 (the number associated with Shah's device).  Purdon called the Empress of China and the employee who answered the phone was not aware of Lum; upon further inquiry, either Beam or Replogle told Purdon that Lum was not an employee but the owner.  Lum's credit report indicated his credit was "lousy," with "38 serious delinquencies."

One of Among the documents used by CCF to substantiate Lum's income, Purdon identified leases for the three condominiums, indicating Lum as the lessor.[7]  Purdon also identified statements for a Charles Schwab account in Lum's name that showed consistent income.  Schwab, however, had no record of Winston Lum as a Schwab client, nor any account number matching the one listed on the statements provided to CCF.  The account number that appeared on another document in the CCF file  was associated with Cliff Lambert of 317 Camino Norte, Palm Springs.  A Schwab statement in the name of Cliff Lambert was found on a computer seized from Daniel Garcia in a different case, under the directory "Macintosh HD/user/Danny/document/Kaushal Niroula/fake," in a file created on  November 21, 2008.

The grant deeds were among the documents obtained by CCF in connection with the loan application.  There was also a "declaration affidavit" signed by Hwang which the company wanted because the transfer to Lum was recent, a document "assuring" the company that the transfer "was what it was."

CCF obtained appraisals of the properties.  On January 31, 2009, appraiser Casey Simms went to units 4902 and 5501 with Beam, whom he subsequently identified as Niroula.  Beam had keys for two of the units but not for unit 4802, so they arranged for Simms to return on February 14.  On that date, Beam had two men with him, one of whom Simms identified as Shah.  While Simms inspected unit 4802, the two men talked

---

[7] The lease for unit 5501 was for $15,000 per month and the leases for units 4802 and 4902 were for $7,500 per month each.

9

in a corner and Beam followed Simms around.  The unit was furnished, and Beam said it was occupied by a tenant.  Simms appraised unit 4802 and unit 4902 at $1.225 million and unit 5501 at $2.4 million.

In February 2009, Purdon and the investors funding the loan, Peter and Frans DeWitte, went to San Francisco to see the properties with Beam, who had keys to each.  Unit 4802 looked lived-in but no one was home, unit 4902 was vacant and being painted, and unit 5501 was empty.  The group then met with Lum at the St. Regis Hotel, where Purdon understood Lum was living.  Lum answered some of the investors' questions directly; with others he conversed with Beam, who gave a translation.  Lum told the DeWittes that he needed the loan quickly because he was trying to help a family member get out of foreclosure.  After the meeting, the investors agreed to the deal.  The loans on units 4802 and 4902 were $550,000 each and the loan on unit 5501 was $1.1 million.

Purdon identified Lum at trial, as did Peter DeWitte.  Purdon also identified Beam on photographs taken at Rincon Tower on February 24.

Michael Hartshorn, an employee of Shah's who lived at the Quimby ranch, testified that he heard Shah answer the telephone as David Replogle, then have a conversation about trying to set up an appraisal for a property.

The escrow was handled by Commonwealth Title Company (Commonwealth), which arranged for a Cantonese-speaking mobile notary, Wai Yip, to notarize the loan documents.  Yip testified that he was directed to contact Lum's attorney at (415) 935-9646 (again, the number associated with Shah).  He did not speak directly to Lum but, through someone else, arranged to meet Lum at a building downtown at 10:00 p.m. on February 27.  When Yip arrived, Lum's attorney and a younger man who appeared to be Middle Eastern or Indian and Yip understood to be Lum's financial advisor were present; Lum was not and Yip was told that Lum was drunk and could not make it.  One of the two men present walked with a cane.  The next day, February 28, the same group met at a coffee shop with Lum, who signed the documents.  A fingerprint expert testified that the print in Yip's notary book was consistent with a print the expert took from Lum.

10

The loan was funded in early March 2009, with a total of $2.2 million. After fees deducted by Commonwealth, approximately $1.7 million was wired on March 5, 2009, to Trans Escrow Corporation, Tran's company, with notations indicating the funds were to go to Lum.[8] Tran testified Lum would have had to authorize Commonwealth to send these funds to her. Tran got her information about the transaction from Shah and his attorney, Melvin Emerich. At Shah's direction, Tran wired $601,069 to Martini & Chnoogle, a Nevada corporation set up by Emerich (Martini); cut a check for $225,000 to Lum; and cut two checks for $434,422.72 each to Lum International, LLC, an off-shore corporation set up by Shah, which she then exchanged for certified bank checks. Endorsing information on the back of the two checks to Lum International showed they went to Zurcher Kantonalbank in Switzerland.

Martini listed Emerich as president, secretary, treasurer and director. The corporation, through Emerich, opened a bank account on February 6, 2009, with a check written from Telsystems, a telecommunications company owned by Shah. The only other money received into the account was the $601,069 from Trans Escrow on March 6.

Over the next months, payments were made from the Martini account to Shah's company, Telsystems, his relatives and attorneys, and a friend of Emerich's,[9] and for real estate transactions involving Shah, his wife and his companies.[10]

---

[8] For the escrow on unit 4902, $550,000 was wired into the account and $423,742.59 was wired out to Trans Escrow; for unit 4802, $550,000 was wired into the account, and $423,315.21 wired out; and for unit 5501, $1,100,000 was deposited into the account on March 5 and $867,689.81 was sent out to Trans Escrow March 5.

[9] Between March 6 and April 28, approximately 45 checks totaling $282,000 were written from the Martini account to Telsystems. Checks totaling approximately $65,000 were written to Emerich. Checks totaling $22,000 were written to "cash." Checks totaling $14,000 were written to Shah's wife, Elvia Palomino Shah. A $2,000 check written to Gary Wesley bore the notation, " 'Jay's . . . tell-a-day case.' " A check for $3,850, payable to Richard Vantrood, an attorney representing Shah in 2009, noted, " 'Legal fees . . . v . . . Shah.' " A $5,000 check to Craig Bassett, the attorney representing Shah in an action against a title insurance company involving the Quimby property noted, " 'Attorney for Jay.' " A check for $7,500 was payable to Sundowner Inn, LP., a hotel owned by Shah's parents. A $5,000 check was payable to Shah's mother. Five checks, $3,000 each, were written to Morad Afraimi, a friend of Emerich's

Casey Lawrence, a bank and trust manager at 1-800-Company,[11] testified that on March 12, 2009, Shah came into the office with his wife and established Lum International in Nevis, a small island in the British West Indies with very strong asset protection and privacy laws.[12] Shah had 100 percent ownership of Lum International and was the only person with power to make decisions for it. Shah wanted to set up a Swiss bank account for the company, and Lawrence put him in touch with a banker in Switzerland, Pierre Gabris. Although the company's normal practice was to send the original incorporation documents to the client after scanning them into the company's system, Shah specifically directed that the documents be held in the office to be picked up later. There was a sense of urgency in setting up Lum International: "[I]t was very intense." Shah said he was in the middle of a real estate deal and had checks he needed to cash quickly, before his partner changed his mind. The Swiss banker told Lawrence

who allowed Emerich to use his residential address in Nevada as the address for Martini & Chnoogle. Afraimi testified that Emerich loaned him $15,000 in connection with a restaurant Afraimi was opening, in five payments of $3,000 per month.

[10] In March, two electronic fund transfers, $6,916 and $19,999, were taken from the Martini account for payments on loans in the name of Shah and his wife on property at 659 S. 15th Street, San Jose, California.

On May 4, $160,000 was transferred from the account to Ocwen Financial Corporation to pay off a loan in Shah's wife's name on property at 2103 South 11th Street, Los Banos, California. The Shahs refinanced this property, resulting in $80,000 going back into the Martini account " '[F]or Elvia Palomino and Jay Shah' " on July 24. On July 29, $80,000 was transferred from the Martini account to a Trans Escrow account "for the credit of Palomino/Martini & Chnoogle." This escrow account was for the purchase of 530 Adams Avenue, Los Banos, California. A grant deed dated August 6 transferred this property from Martini to Shah. On November 23, 2009, another grant deed transferred the property from Shah and his wife to M & K Properties, LLC.

[11] Lawrence testified that the 1-800-Company sets up limited liability companies and corporations in the United States and offshore, as well as bank accounts for these companies.

[12] According to Lawrence, it is not necessary to go to Nevis to establish a company there, and if someone wants to sue the company they have to post a bond in Nevis. It is difficult to find out who owns a company because "they don't have public records like we do here."

she needed to calm Shah down: " 'He's called me 15 times today.  I've spoken with him three times.  If he calls the bank, they're going to decline his account.  They're going to get suspicious.' "  Shah asked Lawrence several times whether his wife would have access to everything if anything happened to him, which Lawrence thought was "sweet."  Shah also created Wine & Horses, LLC, in Nevis.  Shah was the 100 percent owner and the director of this company; he and his wife were the authorized signatories for the company's bank account, which was in Belize.

Funds from the Lum International account were used to purchase property in California in the name of Shah, his wife and his companies.[13]  On November 26, 2009,

---

[13] On August 31, 2009, at Shah's direction, $171,975.50 was wired from the Lum International account at Zurcher Kantonalbank to the account of Pickford Escrow Company at Comerica Bank.  A Pickford document showed the September 2, 2009, purchase of property at 2071 Genoa Court, Los Banos, California, by Martini and Maria Del-Los-Angeles Palomino, for $170,000, with a credit of $1,000 from Jesus Palomino and Elvia Palomino and a credit of $171,957.50 from Lum International for the benefit of Martini.  A grant deed transferred this property from Martini to Elvia Palomino and Maria Del-Los-Angeles Palomino.

On September 24, 2009, $150,000 was transferred from the Lum International account at Zurcher Kantonalbank to an escrow account at Fidelity National Title Company of California, in trust for Shah, for a property at 317 Crescent, Los Banos, California.  A grant deed dated September 10, 2009, transferred this property from the prior owner to Shah and his wife as community property.  Shah and his wife then transferred ownership of the property to M & K Properties, LLC.  A quitclaim deed recorded on August 17, 2010, transferred the property from M&K Properties, LLC, to appellant's wife as her sole and separate property.  A grant deed dated December 29, 2010, transferred the property from "Megan & Kasi . . . Properties, LLC, a Nevada limited liability company, doing business in the state of Nevada as M & K Properties, LLC, who acquire title as M & K Properties, LLC" to "Megan & Kasi Properties, LLC, a Nevada limited liability company."  This deed was signed by Shah as "managing member."

According to a document filed with the California Secretary of State on December 23, 2010, "Megan & Kasi Properties, LLC" was formed in Nevada on November 19, 2009, listing Shah as its agent at 504 Ross Drive, Sunnyvale.  A document from the Nevada Secretary of State, dated December 22, 2010, shows "M & K Properties, LLC" with a filing date of November 19, 2009, listing Laughlin Associates of Carson City as its registered agent and Shah as an officer or manager with the same address as the agent.

13

Shah took $325,000 from the Lum International account to regain ownership of the Quimby Road ranch, which he had lost in foreclosure.[14]

On December 3, 2009, Shah directed Zurcher Kantonalbank to close the Lum International account and transfer all cash and securities to the Wine & Horses account at Pictet & CIE Bank (Pictet). The securities in the account were valued at approximately $220,000. Subsequently, on January 4, 2010, Shah closed the account and $2,203.98 was transferred to the Wine & Horses account.

Inspector Steger, who traced the funds and analyzed the financial implications in the investigation of this case, testified that he saw no evidence Lum was involved in the formation or activities of Lum International or benefitted from it.

On March 9, 2009, the $225,000 check from Trans Escrow to Lum was deposited into Lum's Bank of America account, which on that date had a beginning balance of zero. By April 28, 2009, withdrawals totaling approximately $215,000 had been taken from the account, the vast majority as teller cash withdrawals that could not be traced. Individual withdrawals did not exceed $10,000, which is the amount triggering the federal offense of "engaging in monetary transactions in property derived from specified unlawful activity" (18 U.S.C.A. § 1957). By May 25, the account had a negative balance.

The branch manager at the Bank of America office on Van Ness Avenue, Dennis Peng, testified that Lum came in almost every day to withdraw money. Lum asked about opening an equity line of credit, a secondary loan, on property at 425 1st Street, where he said he owned several condominiums. Peng was puzzled when the credit line was declined because he knew Lum had a larger line of credit, and suspected a fraud had

---

[14] At Shah's direction, $325,000 was wired from the Lum International account at Zurcher Kantonalbank to the Legal Service Trust Account of Richard Vantrood at South Valley National Bank. Shah had settled the case involving the ranch property but the lender wanted verification that Shah had the funds to repay the loan. Although Vantrood was representing Shah on an unrelated matter, his client trust account was used because the attorney handling the real estate matter did not have a client trust fund. Vandroot confirmed in a letter that he was holding the funds on Shah's behalf. On February 10, he used the funds to purchase a cashier's check which was sent directly to the title company in the real estate matter.

14

occurred against Lum. He contacted the company that made the first loan on the property, learned that "it was the other way around," and was referred to the detective investigating this case. Peng wanted to make sure his bank was protected because a lot of money was taken out from his branch.

In 2009, Real Estate Broker Lorraine Alden, looking for a condominium at One Rincon Tower for a client, sent letters to owners asking if they were interested in selling. One of the letters went to Lum, and on December 17, 2009, Lum called and said he was interested in selling unit 4802 or unit 4902 at "whatever price would sell it quickly." Alden contacted her client, then offered $1.2 million for unit 4802, which was "a little on the low side." Lum immediately accepted the offer verbally, something Alden testified was very unusual. When Alden talked to Lum about getting a key so her client could see the property, Lum said he did not have keys but would figure something out. This, too, was very unusual. The next evening he proposed that Alden meet with him and a locksmith to gain access. She refused the meeting because she did not feel comfortable meeting him in the evening, and because Lum had led her to believe the locksmith was "shady" and would let them into the unit without following the established protocol involving identification and proof of ownership. In the same conversation, Lum offered to lower the price if they would give him an immediate cash payment outside of escrow, which Alden also refused. Lum sounded highly agitated; he talked about wanting to leave the country, was not always coherent, asked if she was with law enforcement or a process server, and told her he had won the penthouse unit in a tennis game. She had a lawyer friend look into Lum and discovered he was being sued and there was a lis pendens on the property, making it non-transferrable. She had no further communication with Lum.

John Abd-El-Malek confirmed that he made an offer to Lum on a unit at 425 1st Street through his agent, Laurie Alden. On December 17, 2009, he signed the contract Alden gave him and took it, with a copy of the deposit check, to the address he was given, which turned out to be a post office box in the mailbox store. The transaction was

15

called off shortly thereafter.  No check was cashed and Abd-El-Malek did not lose any money.

Bail bondsman Corrin Rankin was contacted by Lum when he was trying to get out of jail.  He was not able to post a bond because he did not have anyone to sign or pay the required 10 percent premium.  Lum mentioned that he had properties in San Francisco.  He called several times during and after his incarceration, Rankin became friendly with him and they later met in person.  Lum quitclaimed unit 4802 to Rankin because he wanted her to help him rent his properties by obtaining keys and giving him access.  In agreeing to do this, Rankin was "just being a friend" and trying to help.  She and Lum signed the deed, he put his thumb print on it and, at his request, she recorded it.  When she went to the building and asked in the office how to proceed, she was told that someone else owned the unit and the police were investigating the situation.  On June 1, 2010, Rankin quitclaimed the property back to the original owner.

Hwang never authorized any loans to be taken against her condominiums.  She had never met or talked with Tran and had never met Flores, Chan, Niroula, Lum or Shah before this case started.  She did not rent her units between September 2008 and May 2009.  Hwang learned about the grant deeds when the building's property manager called to say she had been contacted by Kevin Nakamora, who said he was a friend of Lum's, had the grant deed, and wanted the keys for unit 5501.  Hwang called Nakamora but was not able to get any deeds from him.  Hwang recovered title to her properties through a lawsuit, after which she sold units 4802 and 4902.

### Shah's Defense

At the time of trial, Shah was 48 years old, married with two children, and suffered from cerebral palsy.  He owned Telsystems; owned a ranch on Quimby Road in San Jose; and assisted his parents in the operation of two hotels, the Sundowner Hotel in Sunnyvale and the County Inn Hotel in Mountain View.  Shah and his parents would transfer property back and forth to allow them to borrow money for projects.

In 2002, Shah had transferred part of the Quimby property to his parents; in 2007, they deeded the property back to Shah to enable him to obtain money for the down

16

payment on a property he wanted to purchase on South 15th Street in San Jose. Shah used the Quimby property as collateral for a $350,000 nine-month loan and purchased the 15th Street property.

In June 2008, when the loan was due and Shah did not have sufficient funds to pay it, he entered a forbearance agreement with the lender, allowing him until the end of the year, and began to look into refinancing. A lender, Lanny Clark, agreed to take out the loan and deposited $290,000 into an escrow account, but there were complications and the loan did not go through.

One complication was an immigration bond that had been placed on the Quimby property.[15] A Telsystems employee, Dennis, told Shah he had a friend, Kaushal Niroula, who had an immigration visa problem and needed to get out of immigration custody. Dennis said Niroula had a lot of money and would pay Shah $100,000 if Shah was able to get him released. Shah was invited to meet with Niroula's attorney, David Replogle, to discuss the matter. He planned to add the $100,000 to the $290,000 in escrow to complete the refinancing of the Quimby property.

When they met at Replogle's law office in San Francisco, Replogle told Shah that Niroula had funds available but could not access them until he was released. Shah testified that the office was fancy and Replogle was "impeccably" dressed and very articulate. Shah was asked to put up his property to get Niroula released and told that within a couple of days of Niroula's release, Shah would be paid his fee and the collateral for the immigration bond would be replaced. Shah met an immigration lawyer in the office who was also representing Niroula. Shah believed it was an "up and up transaction." On November 3, 2008, he went with Replogle to the bail company Replogle had picked out and arranged the collateral, signing a deed of trust on the Quimby property. Replogle paid the $5,000 fee for the $50,000 bond.

_____

[15] This deed of trust was recorded before completion of the refinancing through Clark, so it was in first position against the property. Clark sought a subordination agreement that would have made the bail bond's lien junior to his, and was repeatedly assured by the escrow agent that it was going through, but it did not, and the $290,000 was returned to Clark.

17

Shah first met Niroula a few days later, when Shah, Dennis, and Dennis's cousin, Danny Garcia, went to Sacramento to pick up Niroula from custody. Niroula said Shah would receive his $100,000 within three business days, and Shah took him to spend those days at the family hotel in Mountain View. Niroula did not come through with the money, saying he had some issues that needed to be handled in order pay Shah. Shah described Niroula as a "likeable guy" who dressed impeccably, spoke with a British accent and "seemed like he came from wealth."

Shah told Niroula that he needed to get the bond "re-collateralized" because he needed the ranch refinanced, and that if Niroula did not do this, Shah would have him taken back into custody. He then learned that this could not be done with a federal immigration bond. Niroula and Replogle repeatedly assured Shah that his money was coming and offered excuses for the delay.

By January 5, 2009, Niroula and Replogle still had not replaced the collateral supporting the immigration bond. They had told Shah that Niroula had obtained money and a piece of property in Palm Springs in settlement of a sexual abuse case against a man in Palm Springs, and had shown him the settlement agreement. On January 5, they met in Tran's office and Russell Manning, with power of attorney for Clifford Lambert, signed a grant deed from Lambert to Niroula for a house in Palm Springs, then Niroula signed a grant deed transferring the house to Shah's living trust. A memorandum of understanding stated that Niroula was transferring his interest in the property to Shah, in consideration of which Shah agreed to pay Niroula $185,000.[16] Shah had Tran's brother take the deeds to Palm Springs and have them recorded.

Shah planned to sell the Palm Springs property but was not able to do so, or to take a loan against it, because it was under a conservatorship. At some point, Shah told Niroula he had heard that Lambert was missing and the Palm Springs property could not be negotiated. Niroula said Lambert had just gone away because he was embarrassed

---

[16] Shah testified that this was what he calculated to be the difference between the amount for which he would be able to sell the property and the $100,000 Niroula owed him.

about the sexual harassment suit. Later, in November 2009, Lambert's conservator sued Shah, his living trust, Manning, and Niroula, and the trust ultimately quitclaimed the Palm Springs property to the conservator. Meanwhile, in February 2009, Shah's Quimby property was foreclosed.

Niroula told Shah he could get the money for Shah to regain his property from a friend who owed Niroula money, a foreign national whose aunt was going to be giving the friend some properties. Shah met the friend, William Lum, once at the Sundowner Hotel. Niroula later called Shah with the addresses of the properties Lum was going to be receiving and Shah asked Tran to find out whether there were any problems with their titles. She informed him the properties were owned by "some Chinese woman" "free and clear."

Shah testified that around the middle of January 2009, Niroula brought him the three notarized deeds, which Shah faxed to Tran and to John Flores, a mortgage broker with whom he had worked before. Shah testified that he had not seen the deeds previously. Shah helped Niroula fill out a loan application on behalf of Lum and faxed the application to Flores. Shah believed Tran was going to handle the escrow regarding Lum's loan against the properties. He understood that before Lum would be able to get a loan, Tran would have to obtain a notarized statement from Hwang confirming she had transferred the properties to Lum. Shah had nothing to do with transferring the matter to Commonwealth.

Shah testified that he went to the appraisals to make sure everything that had been represented was true and the transaction was legitimate. He testified that on February 14, he went into two vacant units, not the furnished one that was being appraised that day. Shah also was present when Lum signed the loan documents and testified that Yip, Replogle and Niroula were also there.

Shah acknowledged that he gave Tran the instructions on how to disburse the funds received from Commonwealth but testified he did so pursuant to direction from Niroula and Replogle. Shah testified that after Niroula and Replogle were arrested, around March 2, 2009, Niroula asked Shah to hold the proceeds of the loan for him

19

outside the United States. Shah contacted 1-800-Company and set up a corporation and bank account into which Niroula's money could be deposited. He told Lawrence he was opening the new account for himself because he did not have Niroula's passport, but he was holding the money in trust for Niroula. In order to keep track of Niroula's money, Shah named the corporation Lum International, after the "Lum deal." He gave his wife access to the account because someone needed to be able to access it if something happened to him. Shah also had 1-800-Company set up a corporation called Wine & Horses, with the intention of building a winery at his ranch.

Shah invested a significant portion of the money in the Lum International Swiss account in United States real estate because the returns were better than what he was getting in Switzerland. When he bought property with these funds, he put them in the name of Martini because he needed to use the company's liquid funds to show proof of funds. He then transferred property to his wife and to Megan & Kasi with the intention of refinancing and returning the funds to Lum International. He also used $325,000 from Lum International to repurchase his ranch property, intending to return these funds as soon as the ranch transaction was complete and he could refinance.

In late 2009, Shah learned that Zurcher Kantonalbank was going to close the accounts of United States investors. He intended to set up an account for Lum International at a Pictet, where he had his Wine & Horses account, but this was going to take some time because Pictet was "picky" about its clients, so Shah deposited the Lum International funds into his Wine & Horses account meanwhile. He had not yet been able to set up the new account when he was arrested on March 23, 2010.

According to Shah, of the loan proceeds that went into Martini, $500,000 was his, to be used to regain the ranch that Niroula caused him to lose, and the other $100,000 was for Niroula's attorney fees.

**Lum's Defense**

Lum did not testify at trial.

San Francisco Deputy Sheriff Kevin Nakagawa testified that Lum, an old friend, contacted him in March 2009, concerned about mail he had received that looked official

20

and he did not understand. The document looked like a title deed or transfer of property with Lum's name on it. When Nakagawa tried to explain this, Lum still did not understand, and "the story that he told me didn't quite make any sense," so Nakagawa contacted the title company and was told the property had been legally transferred to Lum. He was then put in contact with Hwang, who said she owned the property.

## DISCUSSION

### I.

This case was presented to the jury over the course of nearly three months, from the beginning of opening statements on April 18, 2012, to the beginning of jury deliberations late in the day on July 9. After eight days of deliberations, on July 24, the jurors were dismissed until August 20. The court's minutes for July 24 state, "Due to scheduling issues, the trial will resume on 8-20-12." The jury returned its verdicts on September 19, after an additional 14 days of deliberations. Shah argues that, absent his personal waiver, the lengthy break during the critical stage of deliberations was structural error requiring reversal of his convictions without regard to prejudice or forfeiture. Lum joins in this argument.[17]

The matter of a lengthy break during the trial was raised before trial, on March 12, when the court and counsel discussed scheduling. In response to a request from Lum's attorney that court not be in session from July 27 to August 18, due to his preplanned vacation, the court stated, "I'll note that here. Hopefully, we will be through with this trial." Counsel for Shah indicated he would be unavailable on April 5, 6 and 9.

On March 19, to enable the court to determine the projected length of trial for purposes of jury selection, the court and counsel discussed at length each attorney's time estimates for direct and cross examination of the expected witnesses. The next day, the court indicated that it anticipated a six-month trial and confirmed that court would not be in session on April 5, 6 and 9, and July 30 through August 16. It was agreed that for purposes of jury selection, October 31 would be used as the expected end date for the

---

[17] Lum additionally joins in Shah's other arguments on appeal "insofar as they may be beneficial to him."

21

trial. On March 26, updating counsel on the status of determining juror hardships, the court noted that the prospective jurors knew the dates thus far planned for court to not be in session, including "the three weeks—end of July/August." None of the attorneys raised any objection to the dates in any of these discussions.

On June 6, one of the jurors submitted a note to the court asking, "Are you still under the impression that the trial will end before the July-August recess?" The note indicated the juror was hoping to make travel plans. The court told the jury, "As you can see, we are now in the defense case, and we expect the trial to end by the time of the July recess, but there's no guarantees. You're still hardshipped through August 30th - October 31st. [¶] But it would be a wrong impression to tell you that I think the trial will go anywhere near that length of time, but I don't know." The court stated that it did not know how long the jurors would need for deliberations, and that they needed to take as much time as necessary, without an artificial deadline. Juror No. 3 asked whether the three week break in July-August was still guaranteed. The court responded, "We have to have those three weeks off. That is a long-standing prior commitment of one of the attorneys that we agreed—that's why it was set at the time we did the hardships, that it was agreed that those three weeks would—we would not be in session no matter what; so those three weeks were established." Counsel did not object.

On July 23, the jury informed the court that one of the jurors had had a death in the family and did not know yet when the funeral would be; on July 24, a Tuesday, the jury communicated that it would be taking July 25 and 26 off to give the juror time to be with his family for the funeral. The court responded with a note telling the jury to return on August 20 to continue deliberations and reminding it to "remember the admonition that you are not to discuss this case during your absence, and may only discuss the case again when all 12 of you are reassembled in the jury room." The record does not reflect any objection from counsel.

The jury returned and resumed deliberations on August 20. It deliberated 14 days, and on September 17, informed the court it had reached a verdict.

Of the 26 calendar day recess, 12 were court days missed due to the preplanned recess. The others were weekends, Fridays when the court was regularly not in session, and the two court days missed due to the death in the family of one of the jurors.

A trial court has discretion to allow a recess during jury deliberations for good cause. (*People v. Santamaria* (1991) 229 Cal.App.3d 269*, 276-277 (*Santamaria*); Pen. Code, §§ 1050, 1121.) Its exercise of discretion " 'must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' " (*Santamaria,* at p. 276.) The trial court abuses its discretion if its actions exceed the bounds of reason under the circumstances. (*Id.* at p. 277.)

Shah relies heavily upon *Santamaria*, which held that the trial court abused its discretion in permitting an 11-day recess (seven court days) during jury deliberations, without good cause, to accommodate the judge's plans to be "away." (*Santamaria, supra,* 229 Cal.App.3d at p. 275.) The prospective jurors had been informed they would be "off" for the specified week. (*Ibid.*) The jury began deliberations on the 14th day of trial; after two days of deliberations, the court adjourned for 11 days, and the jury returned a verdict in the early afternoon of the day they returned. (*Id.* at p. 275.) The prosecutor had suggested having another judge preside over deliberations, to which the defense had not objected. (*Id.* at pp. 276, 278.) In finding error, *Santamaria* particularly noted the length of the recess and the critical stage of the proceedings at which it occurred, which risked "prejudice to the defendant both from the possibility that jurors might discuss the case with outsiders" and "from the possibility that their recollections of the evidence, the arguments, and the court's instructions may become dulled or confused." (*Id.* at p. 278.) The court also pointed to the absence of good cause for the recess and the silence of the record as to why the court did not avoid the disruption by substituting another judge to oversee deliberations. (*Ibid*.)

The *Santamaria* court found reversal required without proof of actual prejudice. (*Santamaria*, *supra*, 229 Cal.App.3d at pp. 280-283.) Emphasizing the impossibility of proving that the interruption in deliberations had a negative effect on jurors' memory of complicated facts and of instructions, or that jurors improperly discussed the case with

23

others during the recess, and viewing the recess, in the circumstances presented, as an "[e]xtreme variation[]" from the "established mode of trial," *Santamaria* found the defendant's due process rights were violated and reversal required. (*Id.* at p. 283.)

Additionally, in a footnote responding to the Attorney General's request, after oral argument, to argue that the appellant had forfeited the jury adjournment issue by not objecting in the trial court, *Santamaria* stated that "the court's abuse of discretion here was of such magnitude that whether or not appellant objected is irrelevant." (*Santamaria*, *supra*, 229 Cal.App.3d at p. 279, fn. 7.)

We consider this last point first, as neither Shah nor the other defendants in this case objected to the recess; to the contrary, the matter was discussed and agreed upon as part of the overall scheduling before trial. Generally, a defendant's failure to object to separation of the jury, even during deliberations, precludes raising the issue on appeal. (*People v. Ochoa* (2001) 26 Cal.4th 398, 440 (*Ochoa*), abrogated on different ground in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14; *People v. Johnson* (1993) 19 Cal.App.4th 778, 791; *People v. Harris* (1977) 73 Cal.App.3d 76, 83.) Of the *Santamaria* footnote indicating the defendant's failure to object was irrelevant, the Supreme Court stated in *Ochoa,* "The *Santamaria* opinion, however, did not purport to abrogate the duty to object generally. On its facts, it found the court's abuse was so great as to warrant appellate relief notwithstanding the absence of objection." (*Ochoa,* at pp. 440-441.) Distinguishing its facts from those in *Santamaria*, *Ochoa* followed the general rule requiring objection in the trial court.[18] (*Ochoa,* at pp. 440-441.) *Ochoa* thus makes clear that *Santamaria* cannot be taken to excuse every failure to object to jury separation, but that failure to object *may* be excused when the circumstances are sufficiently egregious. This point is consistent with the general principle that appellate courts have

---

[18] *Ochoa* involved a preplanned nine-day break (five court days) in the middle of what was expected to be a three-week trial, due to the prosecutor's planned vacation. The prosecutor had asked to delay the start of the trial but the court preferred to begin sooner, with the week-long break mid-trial, and the defense did not object. (*Ochoa*, *supra*, 26 Cal.4th at p. 440.)

24

discretion to consider claims of significant constitutional error despite the absence of a specific and timely objection below.  (*People v. Vera* (1997) 15 Cal.4th 269, 276-277.)

*Johnson, supra,* 19 Cal.App.4th at pages 790-791, the case *Ochoa* followed approvingly in finding forfeiture, "reject[ed] the claim that a break in proceedings, which was previously agreed to by appellants, can constitute reversible error on appeal."  In that case, the trial was expected to be, and was, "very lengthy."  (*Id.* at p. 792.)  In August, the trial judge stated that it would be "wrong" to require the jurors to be in session during the holidays, when many people have travel plans or family obligations, and all parties agreed there should be a "long" holiday recess.  (*Ibid.*)  The jurors were told they could make or confirm plans in reliance upon this schedule.  (*Ibid.*)  The recess was for 17 calendar days, eight of which would have been weekends or holidays, and fell during jury deliberations.  (*Ibid.*)  No one objected.  (*Ibid.*)

Distinguishing *Santamaria,* the *Johnson* court explained, "In *Santamaria*, as opposed to the present case, the parties did *not* previously agree to and consent to an adjournment during deliberations; since the adjournment was caused by the fact that the trial judge was leaving town, the parties sought to have another judge take the verdict, so that the jury could continue its deliberations as allowed by section 1053.  The trial court irrationally denied this request for no good reason, thus abusing its discretion.  (*People v. Santamaria*, *supra*, 229 Cal.App.3d at pp. 276-279 & fn. 7.)"  (*Johnson, supra,* 19 Cal.App.4th at pp. 792-793.)  By contrast, in *Johnson*, the defendants "agreed to the break, and no party objected to it; obviously it would not have been possible to continue deliberations with another judge under section 1053, since the very purpose of the break was to accommodate the travel plans of the *jurors*, not merely the travel plans of the trial judge, as occurred in *Santamaria*."  (*Johnson,* at p. 793.)  As to the *Santamaria* footnote, *Johnson* stated, "Nor does the *Santamaria* court opine, even in dicta, that an appellant who has affirmatively agreed to even a long break in deliberations may bide his time and

later complain about the matter on appeal, as appellants seek to do here." (*Id.* at pp. 793-794.)[19]

In our view, the present case is far more similar to *Johnson* than to *Santamaria.* Based on the parties' detailed discussion of witnesses' expected testimony and time estimates, the court determined that the case was likely to last six months, extending through the entire summer and well into the fall. The court was well aware it would be difficult to find jurors able and willing to serve in these circumstances, specifically referring to the summer, as well as the overall length of trial; for this reason, the court indicated they would need some 1200 people in the jury pool and suggested selecting eight alternates rather than six if possible.[20] The prospective jurors were informed that the court would be in recess for the specified weeks. The reason for the break was Lum's attorney's pre-planned vacation, but the jurors were told from the outset that they could count on this break and apparently did so, as indicated by the juror's question in early June whether the court was "still under the impression that the trial will end before the July-August recess," because the juror wanted to make travel plans. Evidently, there had already been discussion of the fact that the case was moving more quickly than the original six-month estimate. Based on that original estimate, however, no one would have expected the planned break to fall during jury deliberations; this occurred only because the case moved faster than anticipated. In the context of a six-month trial expected to consume the entire summer, permitting a break the jurors could count on and

---

[19] Shah asserts that *Ochoa* "confirmed that an appellate court, when faced with the egregious circumstances of an eleven day separation (and, *a fortiori*, three weeks) during deliberations, must sustain a claim of improper adjournment, even in the absence of an objection below." If this characterization is intended to suggest that an 11-day break during deliberations is *necessarily* "egregious" and must be sustained even in the absence of an objection below, it is belied by *Johnson,* which upheld a 17-day break during deliberations and was approved by *Ochoa*.

[20] The court commented, "For this length of a trial, we are going to be getting pretty much the people who are willing and wanting to do this. You can't strong-arm a person like you can for a three-day trial as much—so, financial, medical reasons, and so on. And we are also going through summer."

26

plan for was no less reasonable than a court recessing over the winter holiday season. (*Johnson, supra,* 19 Cal.App.4th at pp. 790-791; *Hamilton v. Vasquez* (9th Cir. 1994) 17 F.3d 1149, 1159.) None of the defendants objected when the break was first scheduled before trial began and none objected when the subject was raised again in June, at which point it was apparent the anticipated timing of the trial had changed. As the break was occasioned by Lum's attorney's unavailability and, subsequently, jurors' potential or actual reliance, the alternative discussed in *Santamaria* of having a different judge preside over deliberations was not an option. And, unlike *Santamaria,* in which the jury's verdict was reached on the first day back from recess, the jury in the present case deliberated for 14 days after it returned to court.[21]

The additional cases upon which Shah relies do not alter our view. *United States v. Hay* (9th Cir. 1997) 122 F.3d 1233 (*Hay*) held the trial court abused its discretion in ordering a 48-day recess at the close of evidence in order to accommodate juror vacations. The *Hay* court stated that the most important issue was the "unprecedented" length of the jury separation—it found recesses of 11 and 18 days in other cases (*United States v. Diggs* (9th Cir. 1981) 649 F.2d 731, 737-738 [11-day recess due to illness of juror]; *Hamilton v. Vasquez, supra,* 17 F.3d at p. 1159 [18-day preplanned adjournment to which defendant did not object]) "not comparable." (*Hay*, at p. 1236.) The recess in the present case, while lengthy, was little more than half as long as the one in *Hay*.

---

[21] We also observe that the record suggests no actual prejudice from the recess. As we have said, the jury deliberated for eight days before the break and an additional 14 afterward. During both phases of deliberations, the jury was active in requesting readback of testimony and asking questions of the court. The verdicts reflect careful consideration of the evidence. Shah was convicted of all charges but, with respect to conspiracy, only of conspiracy to commit money laundering, not conspiracy to commit grand theft or file false deeds. Lum was found guilty of grand theft, attempted grand theft, and filing false deeds of trust, but not guilty of filing false grant deeds or burglary; the jury was unable to reach verdicts as to his guilt on the charges of conspiracy, identity theft, and money laundering or on the special allegation relating to value of the money laundering transactions. Emerich, the third defendant and not a party to this appeal, was found not guilty of filing false deeds of trust and the jury was unable to reach verdicts on the other charges against him.

Unlike the present case, the recess in *Hay* was not planned from the start of trial; it was announced when the trial, originally expected to last two months, was in its fourth month and jurors had begun to inform the court of planned summer vacations. (*Id.* at pp. 1234-1235.) And, significantly, unlike the present case, the defendant did not agree to the recess. To the contrary, when the issue arose, he moved for a mistrial. (*Id.* at p. 1235.) *Hay* does not support Shah's attempt to predicate reversible error on a procedure to which he, through counsel, affirmatively agreed. (See *Johnson, supra,* 19 Cal.App.4th at p. 780.)

*People v. Gray* (2005) 37 Cal.4th 168, 226-227, upheld a 338-day recess between the guilt and penalty phases of trial, finding the defendant was precluded from raising the issue on appeal because he did not object in the trial court and in fact instigated the delay by pursuing a writ petition in the Court of Appeal that led to a stay of trial. Shah offers *Gray* for its emphasis of the significance of breaks during deliberations: After distinguishing *Hay, supra,*122 F.3d 1233, the *Gray* court discussed *Santamaria*: "In one sense, *Santamaria* presents an even more egregious case than in *Hay,* for the trial court in *Santamaria* continued the case for 11 days *in the middle of jury deliberations,* apparently to accommodate the trial judge's schedule. (*Santamaria, supra*, [229 Cal.App.4th] at pp. 274-275.)" (*Gray*, at pp. 227-228.) *Gray* noted the *Santamaria* court's emphasis of "the risk such delay could engender, from faded memories to juror contamination from outside sources." (*Gray*, at p. 228.) But *Gray* went on to note that *Santamaria* was not based solely on the stage of the proceedings: It also "stressed the absence of good cause for the delay" and "relied on the availability of alternatives." (*Gray,* at p. 228.)

Here, in light of the length and timing of the trial, all parties' agreement to the schedule from the outset, and the absence of any objection later, when the subject of the planned recess was raised by a juror, when deliberations began or when the recess was called, we find neither abuse of discretion nor egregious circumstances justifying Shah's raising the issue for the first time on appeal.[22]

_____

[22] Shah argues that he cannot be viewed as having waived his "rights under *Santamaria,*" which he describes as his due process right "to have jury deliberations

28

## II.

Shah next contends that the trial court erred in excluding evidence of a prior unrelated fraud perpetrated by Niroula and in admitting evidence of a magicJack device registered by Shah to the name "Dumb Cops." Shah argues that the entire scheme underlying this case was contrived by Niroula, Garcia and Replogle, who duped many others—including Shigenzane, Chan, Flores, Purdon, and Tran—into unwitting participation. Noting the length of the jury's deliberations, Shah argues that the difficult issues in the case did not involve the defendants' conduct but their knowledge and intent. In his view, there was little evidence to disprove his defense—that he acted as he did only because of his desire to save his ranch and without knowledge of any fraud, duped just like the other participants whom the prosecutor did not charge with any offense. Accordingly, Shah argues that the court's erroneous exclusion of evidence that would have bolstered his claim that Niroula duped him, and erroneous admission of evidence that was prejudicial to him, combined to deprive him of due process and a fair trial.[23]

---

conducted without an unduly long and unjustified separation" because he did not *personally* agree to the "enormous" break after a full advisement of rights. (*People v. Traugott* (2010) 184 Cal.App.4th 492, 500 [waiver of right to trial by 12 jurors who deliberate and reach unanimous verdict must be express waiver by defendant personally, not by counsel].) This argument, addressing affirmative waiver as distinct from forfeiture resulting from failure to object (see *People v. Saunders* (1993) 5 Cal.4th 580, 590; *United States v. Olano* (1993) 507 U.S. 725, 733), assumes that the break in deliberations in the present case was at least as bad as, if not worse than, that in *Santamaria.* Having rejected this view of the facts, we need not address the argument.

[23] Shah argues, "While there was no evidence that Shah participated in the forgeries, he definitely played a pivotal role in arranging for Lum to obtain the private loans against the Rincon properties, and he was centrally involved in managing the proceeds of the loans, as was Emerich. Yet the jury struggled over twenty two days of deliberations before returning verdicts against Shah." He then goes on to explain that the critical issues were knowledge and intent rather than conduct. The apparent implication is that the jury struggled for 22 days over the question of Shah's knowledge and intent. Since the jury was unable to reach verdicts on many of the counts against Lum and Emerich, however, it appears likely that more of its "struggle" was over the guilt of these defendants than over Shah's.

## A.

Shah sought to present the testimony of Martin Hamilton, the former president of New College, a now-defunct institution in San Francisco. According to Shah's offer of proof, Niroula became a student at New College in 2002 and in 2007 became unable to pay his tuition. Niroula told Hamilton he had a lot of money from a land deal in Nepal and income as an employee of the Foreign Ministry Office in India, and would be able to pay tuition "when the money got freed up." He showed Hamilton a bank statement showing assets of $3 million and told Hamilton that once the banks were unfrozen, he would donate $1 million to New College. Niroula had an "air of legitimacy."

According to the report of an investigator who interviewed Hamilton, Hamilton related that Niroula had acted as a "spokesperson" for several Nepalese students who owed tuition because the king of Nepal had declared martial law and frozen all bank accounts. Niroula arranged for Hamilton to have dinner with a person he said was the Deputy Foreign Minister, and to visit some wineries and an organic farm with him. Looking back, Hamilton said he had no idea whether the person was actually a Deputy Foreign Minister, but the contacts "definitely helped further the ruse that Niroula was a man of means and had connections to people who could make things happen." Hamilton received a call from a person Niroula had described as his personal banker in Nepal, who stated he had been authorized to send the New College $1 million. Shortly thereafter, Niroula called Hamilton, crying and very upset, saying that his sister had to go to India to verify the $1 million transaction and had been kidnapped on the way. Hamilton loaned Niroula $3,000 to help secure the sister's release; neither this, nor $22,000 Hamilton loaned Niroula over his time at New College was ever repaid.

Shah sought admission of this evidence under Evidence Code section 1101, subdivision (b), arguing that it showed Niroula acted according to a common design of using his "elegant bearing and manner to spin false promises holding out hope of repayment," saying money is available but his access to it impeded, promising imminent payment and bringing third parties into the scheme to deceive his victim. Shah

30

maintained that the evidence was relevant to the issue of whether Niroula deceived Shah into assisting with the "Shirley Hwang scenario."

"Subdivision (a) of section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393.)[24]

The trial court found the evidence inadmissible under Evidence Code section 1101, subdivision (b), because it viewed the exception for admissibility of evidence relevant to prove facts such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident" (Evid. Code, § 1101, subd. (b)) as pertaining to proof of *Niroula's* intent, etc., not that of the defendants. The court stated that because there was no dispute about Niroula's deceitful conduct,[25] the question whether he had a pattern of such conduct was irrelevant and, therefore, more prejudicial than probative.

---

[24] Evidence Code section 1101 provides:

"(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.

"(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

[25] The trial court stated, "It seems that everyone agrees that Mr. Niroula—even the defendants—is someone—and the prosecution—is someone who is not truthful and spins elaborate tales that involve schemes to get people to do things that he wants them to do. [¶] That's not a disputed issue."

31

The court expressed concern that allowing the evidence might "create a type of sympathy for the defendants that have nothing to do with whether or not they were knowing participants or unwitting persons involved in these schemes."

We agree with the trial court that Evidence Code section 1101, subdivision (b), is concerned with evidence of a person's conduct on a prior occasion that is relevant to a disputed issue about *that person* (other than disposition to commit such conduct). Proof that Niroula engaged in cons based on a common design would not be relevant to prove anything about *Shah's* intent. Contrary to Shah's characterization, the trial court did not rule that "bad act" evidence under Evidence Code section 1101, subdivision (b), "is limited to proof of a *defendant's* motive, opportunity, and so forth" or to "bad acts by a *criminal defendant*." The court simply held that Evidence Code section 1101 was concerned with evidence of prior conduct used to prove something about the person who engaged in that conduct.

While Shah's argument for admissibility was based entirely upon Evidence Code section 1101, the trial court also stated that it viewed the proposed evidence as more prejudicial than probative, noting that it might provoke improper sympathy for the defendants, it was "a type of impermissible character evidence" regarding the defendants' vulnerability to being conned and that it would be confusing to the jury. Some of these comments were directed toward Lum's counsel, who argued a different basis for admitting Hamilton's testimony: that Hamilton's testimony was relevant to the issue of the defendants' intent and the reasonableness of the defendants' reliance upon Niroula's representations. Anticipating the prosecutor's argument that only an idiot would believe the inherently improbable stories Niroula told, counsel wanted to show that Niroula was able to convince the head of college, "a man above reproach."[26]

---

[26] Lum's attorney, agreeing with the court that Niroula's common design was not relevant to a disputed issue, explained that it was precisely because the defense was not seeking to use the evidence of Niroula's conduct against *Niroula* that the evidence was not precluded by Evidence Code section 1101. As he explained the point, Evidence Code section 1101 precludes using evidence of a person's prior act against that person except for one of the specified purposes, such as to prove the person's intent. But Lum did not

32

The trial court has broad discretion in determining the relevance of evidence, and we review its rulings on the admissibility of evidence for abuse of discretion. (*People v. Harris* (2005) 37 Cal.4th 310, 337.) " 'A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)" (*People v. Brown* (2003) 31 Cal.4th 518, 534.) " '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Rains* (1999) 75 Cal.App.4th 1165, 1170.)" (*People v. Richardson* (2008) 43 Cal.4th 959, 1001.)

" ' "Only relevant evidence is admissible (Evid. Code, § 350; [citations]), and, except as otherwise provided by statute, all relevant evidence is admissible[.] (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d) . . .)." [Citation.] "Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" [Citation.]' " (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

Here, the relevant fact was whether appellants intended to participate in the criminal offenses or were innocently duped by Niroula. The purpose of the proposed evidence was to bolster Shah's testimony that he did not intend to participate in criminal activity by showing that Hamilton fell for one of Niroula's schemes. But evidence that

---

want to use Niroula's prior conduct to prove anything about *Niroula.* Instead, he wanted to show that it was reasonable for appellants to rely upon Niroula's representations because another person "of some considerable stature in the community" also relied upon them. According to Lum, Evidence Code section 1101 did not apply to this situation.

Hamilton was duped could not prove anything about Shah's or Lum's knowledge or intent in the present case. Hamilton was unrelated to the present case and the jury would have known nothing about him other than that he was at the time the president of a since-defunct college. His vulnerabilities and motivations were unknown, and in any event could not be ascribed to Shah or Lum. Further, as the trial court emphasized, there was no question Niroula was "someone who is not truthful and spins elaborate tales that involve schemes to get people to do things that he wants them to do." That Niroula could do this successfully was demonstrated to the jury by the various witnesses who, apparently, were taken in by his conduct here, including Chan, the real estate agent who first introduced Sid Jones to Shigenzane; Shigenzane, who discussed sale of the Rincon units to Jones; Flores and Purdon, who were told Josh Beam was Lum's interpreter and talked with Beam during the loan process; and the DeWittes, who agreed to the loan after Beam showed them the properties. We can find no abuse of discretion in the trial court's ruling.

Nor would we find any error in excluding this evidence as more prejudicial than probative. As just explained, the jury was well aware that Niroula had deceived others at various stages of the scheme underlying this case. Shah argues that Hamilton's testimony would have been more compelling than this other evidence because Hamilton's contact with Niroula extended over a longer period than did his contact with these witnesses. But the fact that Hamilton was fooled by Niroula still would have had no logical bearing on whether appellants, who might have been more or less susceptible to Niroula's tactics, were taken in by a ruse, especially since the scheme in the present case differed considerably in its particulars from the one to which Hamilton apparently succumbed.

Shah's defense would have required the jury to believe that he thought Niroula's actions were legitimate despite numerous indications they were anything but, including Niroula using an entirely different name when he and Shah met the investors at the condominiums and the fact that the ostensible owner of the Rincon condominiums (Lum) was receiving only 10 percent of the proceeds of the loans taken against the properties. Even under his own defense evidence, it is difficult to imagine how Shah would not have

34

been suspicious when, in early March 2009, a few months after Niroula assigned to him Lambert's Palm Springs property, he learned Niroula had been arrested for murdering Lambert. And evidence such as the phone number registered to Shah being given to Shigenzane as Prashat Kahn's number and to Purdon as Replogle's number (not to mention Hartshorn's testimony that he heard Shah answer his phone as Replogle) is difficult to square with the theory of Shah as an innocent participant in legal financial transactions. Given all the evidence in the case, we see no reasonable probability Shah would have obtained a more favorable outcome at trial if the court had permitted Hamilton to testify. (*People v. Richardson, supra,* 43 Cal.4th at p. 1001; *People v. Watson, supra,* 46 Cal.2d at p. 836.)

### B.

As we have said, the phone number (415) 935-9646 was given to witnesses in this case as the number for Prashat Kahn and for David Replogle. This phone number belonged to a magicJack device registered to Shah.[27] Service began on this account, No. 8589425, on December 30, 2008, for phone number (408) 940-7054, then the number was switched to (415) 935-9646 on February 19, 2009. The address on the account was 504 Ross Drive, Sunnyvale. The email provided for the account when the device was registered in December 2008, "JayShahTelsystemsInc.," was changed through the account on January 23, 2009, to JayShah@Sundowner.com, and then on March 11, 2009, to DavidReplogle@hushmail.com.

On January 22, 2009, another account, No. 8650888, was created with several associated phone numbers including (408) 345-6027. The name for this account was "Dumb Cops." The credit cards used on the account were in the names of Jay Shah and Elvia Shah, and the addresses associated with the account were 504 Ross Drive,

---

[27] One magicJack device can have more than one phone number, and multiple devices can have the same phone number.

Sunnyvale, Shah's San Jose Quimby Road address and 15th Street address, and 55 West Younger Avenue, San Jose. [28]

At trial, Shah's attorney objected to the testimony about the "Dumb Cops" account as irrelevant, because the phone number associated with this account played no role in the case, and prejudicial, because it "just serve[d] to embarrass" Shah. Counsel later objected to admission of the exhibit documenting information about this account unless redacted to remove references to "Dumb Cops," arguing that these references were irrelevant to any issue in the case and reflected only a "silly prank": "Apparently, the magicJack was configured so if you dial 911, the cops will see 'Dumb Cops' on their screen. That's why it says 'Dumb Cops.' And it gives the address of the sheriff's department." The only magicJack relevant to the case, counsel urged, was the one associated with telephone number (415) 935-9646; the "Dumb Cops" account was for a different device.

The prosecutor took the position that the evidence was relevant because both magicJack accounts were owned and controlled by Shah; the "Dumb Cops" evidence was not more prejudicial than probative; and it was relevant to show Shah's consciousness of guilt. [29]

---

[28] We take judicial notice of the fact that 55 West Younger Avenue, San Jose, is the address of the Santa Clara County Sheriff's Office. (Evid. Code, § 452, subd. (h).)

[29] The admissibility of the "Dumb Cops" evidence initially was addressed at a sidebar conference that was not reported. After the trial court overruled Shah's objection and the testimony about the account was presented, defense counsel was offered a chance to memorialize the sidebar conference on the record and explained the reasons for his relevance and prejudice objections. The prosecutor responded that the accounts were both controlled by Shah and the evidence was not more prejudicial than probative, as well as that there would be testimony that other witnesses used the number associated with this account; a consciousness of guilt theory was not mentioned. Later, when defense counsel objected to admission of the exhibit documenting the account, the prosecutor argued that the "Dumb Cops" evidence was relevant to Shah's state of mind, showing consciousness of guilt; the account was for a magicJack device Shah's counsel had put in evidence when questioning a witness about how the device functioned; the exhibit had already been published to the jury; and defense counsel was free to argue to the jury that it was just a prank. The court recalled that it had permitted the exhibit to be

36

The prosecutor later referred to the "Dumb Cops" evidence twice in closing argument. After reviewing the evidence that the telephone number given by Pashant Kahn belonged to a magicJack device on Shah's account, the prosecutor argued, "And we know that there's a second account associated with these records. That . . . second account is the Dumb Cops account. The name of the account is Dumb Cops. The Dumb Cops account has several magicJacks on it." The prosecutor stated that the address on the account was for the Sundowner Hotel and the "911" address listed, 55 Younger Avenue—the address to which the police would be directed if someone called 911 from this phone number—was the address of the San Jose Police Department.

The second reference was within a longer discussion of the (415) 935-9646 number: "We know that there's another account. That account is called Dumb Cops. We know that 504 Ross Drive is the Sundowner. We know 15th Street is his property on 15th Street. We know the Quimby Road property is the ranch. But there's more." The prosecutor went on to discuss the change of names and email addresses on the (415) 935-9646 account.

Unlike the magicJack account for (415) 935-9646, which was provided to some witnesses as Beam's phone number and to others as the phone number for Replogle, the number associated with the "Dumb Cops" account was not tied to any of the events at issue in this case. Nor is it apparent how the fact that Shah maintained both accounts is relevant to a disputed issue or, if it were, how the name of the account would be relevant. To support the argument that this evidence demonstrates Shah's consciousness of guilt, respondent urges that the fact the "Dumb Cops" account was opened six days after the false deeds to the Rincon properties were recorded shows Shah was exhibiting the "boastful confidence" of "someone who thought he was pulling off a successful scam and was not going to get caught, because he thought he was smarter than the police." As such, to respondent, it was evidence with a tendency to prove a disputed issue—Shah's intent.

shown to the jury after a sidebar conference at which the prosecutor argued the consciousness of guilt theory and overruled the defense objection.

37

Conduct related to a crime, such as an attempt to suppress evidence or flight following the crime (*People v. Bolin* (1998) 18 Cal.4th 297, 327-328; CALCRIM Nos. 371, 372), or making false or misleading statements relating to the crime (see, *People v. Beyah* (2009) 170 Cal.App.4th 1241, 1247-1248; CALCRIM No. 362), may support an inference of consciousness of guilt. Here, however, the "Dumb Cops" account had no apparent connection to the case aside from the fact that it belonged to Shah. Accordingly, respondent's explanation—that this evidence shows Shah was boasting about the offenses—is somewhat speculative. That Shah created an account called "Dumb Cops" with a telephone number from which a call to 911 would direct an emergency response to the address of the county sheriff's office seems to us more reflective of a general disparagement of the police than consciousness of guilt of the present crimes. As appellant emphasizes, the prosecutor never argued a consciousness of guilt theory to the jury: He mentioned the existence of the "Dumb Cops" account twice, as described above, without suggesting what inference the jury should draw from this evidence.

Nevertheless, any error in admitting this evidence was not prejudicial. The critical issue in the case, as we have said, was Shah's intent—whether he was duped by Niroula into believing the real estate and financial transactions were legitimate or was a knowing participant in the scheme. As explained above, the evidence of the latter was extremely strong. Shah maintains that the "Dumb Cops" evidence "proves nothing, except that Shah has the character trait for making a disparaging joke about police officers." So viewed, the evidence would support the jury drawing a negative inference about Shah's character. In light of all the evidence more directly demonstrating Shah's complicity in the offenses and undermining his professed ignorance of Niroula's scheme, however, we see no reasonable probability the outcome of this trial would have been more favorable to Shah if this evidence had been excluded. (*People v. Richardson, supra,* 43 Cal.4th at p. 1001; *People v. Watson, supra,* 46 Cal.2d at p. 836.)[30]

---

[30] Having rejected Shah's argument that the trial court erred in excluding Hamilton's testimony, we need not address the argument that the erroneous exclusion of

## III.

Shah next challenges his first degree burglary conviction and the accompanying excessive takings enhancement, arguing that the jury was improperly instructed as to the target offenses for burglary and that the enhancement for excessive taking of over $3.2 million was invalid.

Shah's prison sentence was based largely on the burglary conviction and enhancement. In calculating the sentence, which totaled 20 years in prison, the trial court used the first degree burglary conviction as the principal term, imposing an aggravated term of six years, then adding a consecutive four years for the excessive taking under section 12022.6, subdivision (a)(4), and consecutive three-year terms for the section 186.10, subdivision (c), and 186.11, subdivision (a)(2), enhancements. Thus, of Shah's 20-year sentence, the vast majority—16 years—was associated with the burglary count. Additionally, because first degree burglary is a "violent felony" under section 667.5, subdivision (c)(21), Shah is unable to accrue more than 15 percent of worktime credit (§ 2933.1) rather than the 50 percent he would otherwise accrue (§ 2933).

The first degree burglary conviction was based on Shah's entry into Hwang's unit 4802 on February 14, 2009, with appraiser Casey Sims. Acceptance of the prosecution's evidence that Hwang was living in the unit at the time elevated the offense from second to first degree burglary. (§ 460, subd. (a).)[31] Under section 667.5, subdivision (c)(21), a first degree burglary is a "violent felony" if "it is charged and proved that another person, other than an accomplice, was present in the residence during the commission of the burglary." The prosecution's theory was that Sims's presence satisfied the requirement of the presence of a person other than an accomplice.

---

evidence, combined with the erroneous admission of the "Dumb Cops" evidence, violated Shah's federal constitutional right to due process.

[31] "Every burglary of an inhabited dwelling house . . . is burglary of the first degree." (§ 460, subd. (a).) "All other kinds of burglary are of the second degree." (§ 460, subd. (b).)

Shah contends that treating the burglary in the present case as the type of intrusion and violent offense contemplated by sections 460, subdivision (a), and 667.5, subdivision (c)(21), does not serve the purposes of the policies behind these statutes.

Appellant suggests there was some question whether unit 4802 was actually occupied at the time of the February 14 appraisal. He points to Hwang's acknowledgment that the transcript of the preliminary hearing reflected her saying she never lived in any of the units at 425 1st Street, and that the transcript of the civil trial of her suit against Lum and the DeWittes reflected her testifying that the Rincon units were vacant. At trial, however, Hwang testified that she lived in unit 4802 from late September 2008 until she moved into unit 5501 in the summer of 2009, and that unit 4802 during that period was not fully furnished but her bed was there, as were her clothes and food. Regarding her preliminary hearing testimony, Hwang stated at trial that "the truth of the matter is, I lived there," explaining that she was thrown off by the phrasing of the prosecutor's questions at the preliminary hearing and thought she was answering that she *did* live there.[32] Asked about her testimony at the civil trial, she testified that she was "living in there" but did not intend to do so forever as she was looking for work and did not know where she would end up; she had moved things from storage into the unit but had not unpacked everything, it was not organized and "to me, I thought, you know, that was vacant." Hwang testified that she was nervous on the stand and "just assumed everybody knew where [she] lived," and that the police said she lived in unit 4802 when she filed the police report.

Similarly, appellant points to excerpts from Shigezane's preliminary hearing testimony indicating he had told the police the units were uninhabited, and testified that Hwang was storing things in unit 4802 and he did not recall the unit being lived in. At trial, Shigezane testified at trial that he did not remember telling the police the units were

---

[32] Asking about the period from when Hwang purchased the properties until March 2009, the prosecutor had asked, " '[a]t no time during that period did you rent them out or live in them?' " Hwang had responded " '[n]o' " to this question, and testified at trial that if she had not lived in any of the units she would have responded "yes."

40

uninhabited, that if he had said the units were empty, he meant units 4902 and 5501, that he might have said all the units were empty because Hwang was on vacation at the time, and that he did not remember having testified that he did not recall the unit being lived in or that Hwang was storing things in unit 4802. As to the storage point, Shigezane testified, "that's what I said then. . . . But that isn't exactly correct." He testified that he knew Hwang was living in unit 4802 because he visited her there.

Appellant also notes the testimony of Sims, the appraiser, that it appeared unit 4802 was not owner occupied. This is true, but Sims did not testify that the unit appeared uninhabited: He believed unit 4802 was occupied by a tenant rather than by the owner, stating that the unit was furnished and Beam told him it was tenant-occupied. Beam, of course, was Niroula—one of the conspirators in this scheme.

Further, testimony appellant does not mention demonstrated that the unit was inhabited. Purdon, Peter DeWitte, the real estate broker who accompanied the DeWittes on their inspection of the properties, and Police Inspector Gregory Ovanessian, who saw the units with Hwang in early 2009, all testified that unlike the vacant units 4902 and 5501, unit 4802 appeared lived in; Purdon noted "furniture, and things in the closets," DeWitte saw clothes and "material in the kitchen," including a half-empty bottle of wine, and Ovanessian testified that the unit had a bed, a couch and other furniture.

Appellant recognizes that the record precludes a claim of insufficient evidence to support a finding that the condominium was inhabited at the time of the burglary. He argues, however, that because the entry was arranged for a time when no one would be in the unit, it did not implicate the legislative policy underlying the distinction between first and second degree burglary. Instead, appellant likens the offense to a commercial burglary, a wobbler punishable by imprisonment in the county jail or imprisonment for a term of 16 months, two years or three years. (§§ 461, subd. (b), 1170, subd. (h)(1).) Appellant does not directly challenge the first degree burglary conviction; his point is that the harsh sentence he received, and the consequence of it being a violent felony under section 667.5, subdivision (c)(21), is "illogical and unfair."

41

"[T]he greater punishment for first degree burglary reflects the Legislature's recognition of 'the dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence.' " (*People v. Rojos* (1995) 31 Cal.App.4th 611, 614, quoting *People v. Lewis* (1969) 274 Cal.App.2d 912, 920.) " 'Burglary of business premises, even though such premises might have people on them, is not burglary of the first degree because it does not carry the peculiar risks of violence and resulting injury which inhere in the burglary of a home.  [Citation.]  "[T]he fact that a building is used as a home . . . increases such danger:  a person is more likely to react violently to burglary of his living quarters than to burglary of other places because in the former case persons close to him are more likely to be present, because the property threatened is more likely to belong to him, and because the home is usually regarded as a particularly private sanctuary, even as an extension of the person."  [Citation.]' " (*People v. Rodriguez* (2004) 122 Cal.App.4th 121, 132-133, quoting *People v. Hines* (1989) 210 Cal.App.3d 945, 950-951, disapproved on another ground in *People v. Allen* (1999) 21 Cal.4th 846, 864-866; *People v. Little* (2012) 206 Cal.App.4th 1364, 1369.)

" ' "For purposes of the California first degree burglary statute, a structure 'need not be occupied *at the time;* it is inhabited if someone lives there, *even though the person is temporarily absent.*' " ' " (*People v. Little*, *supra*, 206 Cal.App.4th at p. 1369.)  In *Little,* for example, the burglary occurred during an open house held by a real estate agent while the home owners were absent.  The court rejected the defendant's argument that the burglary was not of the first degree because the house was being used for commercial purposes at the time.  (*Id.* at pp. 1368-1369.)  The evidence fully supports the jury's determination that the burglary here was of the first degree.

As for the enhancement under section 667.5, subdivision (c)(21), first degree burglary committed when a person other than an accomplice is present warrants harsher punishment because of its potential for violence (*see Doe v. Saenz* (2006) 140 Cal.App.4th 960, 972); this rationale does not apply when the only person present is an

42

accomplice who shares the perpetrator's purpose. Here, while Shah and Niroula brought Simms to the condominium for the appraisal, Simms was in no way an accomplice in the fraudulent scheme. As the trial court noted, "A home is where we are to be able to feel safe, and someone else was in that home who was not one of the criminal defendant's part of the scheme when Mr. Shah was there. Anything can happen. And that's why that allegation was there." The requirements of the statute were met; indeed, appellant does not directly ask us to invalidate the finding that a person other than an accomplice was present in the residence during the burglary.

## A.

Shah contends his burglary conviction must be reversed because it rests on an invalid legal theory as to the target crime of grand theft. Count 18 alleged that Niroula, Shah and Lum entered the inhabited dwelling occupied by Hwang and Shigezane with the intent to commit the felony offenses of grand theft, filing false deeds and money laundering. The jury was instructed that the target offenses charged in the burglary count were grand theft, filing false or forged documents, identity theft, and money laundering. It was further instructed, "You may not find the defendant guilty of burglary unless you all agree that he intended to commit one of those crimes at the time of the entry. You do not all have to agree on which one of those crimes he intended."

Shah maintains that the grand theft alleged as one of the three target offenses in the burglary charge must have been the theft of Hwang and Shigezane's real property, because it was alleged that in the commission of this offense the defendants took, damaged and destroyed property of a value exceeding $3,200,000 belonging to Hwang and Shigezane. (§ 12022.6, subd. (a)(4).) [33]

---

[33] The value of the real property, according to the evidence at trial, exceeded $3.2 million: As previously indicated, Hwang testified that the condominiums were purchased for $1.4 million, $1.4 million, and $1.9 million; Simms appraised the units at $1.225 million, $1.225 million, and $2.4 million. Count 7 charged the defendants with grand theft of currency belonging to DeWitte Mortgage and Kitco Holdings, with an allegation of excessive taking of more than $1.3 million. This count referred to the loan proceeds, which totaled $2.2 million.

Shah argues that the theory of grand theft as a target offense of the burglary was invalid, first, because the trial court's dismissal of count 2, charging grand theft of the condominiums, was an acquittal that precluded this offense from serving as a target offense for the burglary count. Second, because any taking of Hwang and Shigezane's property necessarily predated the burglary. Shah reasons that if there was a taking, it would have been effectuated by the recording of the deeds for the condominiums on January 16, 2009, and he could not have entered the condominium a month later, on February 14, 2009, with intent to commit a grand theft that had already been committed. Accordingly, Shah argues that his burglary conviction must be reversed unless the prosecution can prove beyond a reasonable doubt that the conviction did not rest on the grand theft theory. (*Griffin v. United States* (1991) 502 U.S. 46 [where one of several theories of liability offered by the prosecution is legally erroneous, conviction must be reversed unless prosecution can prove beyond a reasonable doubt conviction was not based on erroneous theory].)

Preliminarily, respondent maintains that Shah forfeited this issue by failing to object at trial to the court's instructions. "[F]ailure to object to alleged instructional error or to request clarification of the instructions generally forfeits the issue on appeal." (*People v. Lucas* (2014) 60 Cal.4th 153, 291, fn. 51.) Shah, however, relies upon the rule that this court may review any instruction given, even in the absence of an objection, if the defendant's substantial rights were affected. (§ 1259; *People v. Smithey* (1999) 20 Cal.4th 936, 976-977, fn. 7.)

Turning to the merits, the first problem with Shah's argument is that the recording of a fraudulent deed does not convey title to real property. (*People v. Sanders* (1998) 67 Cal.App.4th 1403, 1413 (*Sanders*).) Therefore, putting aside other elements of the offense of grand theft of real property, no theft was actually accomplished by the recording of the deeds. It follows that it was not, as Shah claims, impossible for him to have entered the condominium with the intent to commit grand theft of the real property. Indeed, there was evidence from which the jury could have concluded that the purpose of the entry was connected with an intent to steal the real property. When Shah entered the

44

premises on February 14 with Niroula and the appraiser, a letter of intent was left for Hwang and Shigezane stating the intention of the "Kahn Family Trust" to purchase the three units. This was clearly not the conduct of someone who already "owned" the property. That the court found the evidence was not sufficient to establish all the elements of the offense of grand theft of the properties did not preclude the jury from finding that Shah *intended* to commit grand theft when he entered Hwang's condominium.[34] Accordingly, a juror who viewed the target offense of the burglary as grand theft of the condominiums would not have relied upon an invalid theory.

More importantly, however, we are convinced that any juror who viewed the target offense as grand theft was not contemplating grand theft of the condominiums but rather grand theft of the loan proceeds. This was the theory presented to the jury by the prosecutor.[35] It was abundantly clear from the evidence that the purpose of the scheme as

---

[34] Further, any inconsistency between the acquittal on count 2 and a burglary conviction based on intent to commit grand theft of real property would not be fatal as long as the latter was supported by substantial evidence. "In part, section 954 provides: 'An acquittal of one or more counts shall not be deemed an acquittal of any other count.' It is well established that, under section 954, inconsistent verdicts are allowed to stand if the verdicts are otherwise supported by substantial evidence. (*People v. Lewis* (2001) 25 Cal.4th 610, 656.) '[A]ny verdict of guilty that is sufficiently certain is a valid verdict even though the jury's action in returning it was, in a legal sense, inconsistent with its action in returning another verdict of acquittal or guilt of a different offense.' (6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Judgments, § 75, p. 110.) The rule applies equally to inconsistent enhancement findings (*Lewis, supra,* at p. 656), and to an enhancement finding that is inconsistent with the verdict on a substantive offense (*People v. York* (1992) 11 Cal.App.4th 1506, 1510). In *Lewis,* the court explained, ' "Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient." [Citation.]' (*Lewis, supra,* at p. 656.) 'An inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict. [Citations.]' (*Ibid.*)" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 405-406.)

[35] Indeed, respondent argues on this appeal that the condominiums *could not have been* the target offense because Lum "had title" to the condominiums before the burglary occurred. As we have explained, we disagree with this point.

a whole was to obtain money by borrowing against the properties, and the entry into Hwang's condominium occurred during an appraisal that was part of the loan process. As the prosecutor told the jury, there were three "phases" to the crimes perpetrated in this case: The defendants "found the properties they wanted to take," then they "stole it," and finally they "stole the equity from the property" and "tr[ied] to hide it." The prosecutor emphasized that the overall scheme was about the money, not the property per se: "They stole the actual property. But they don't want a property. They want the money from the property. So they stole the equity from the property. And then, what do they do? They try to hide it." "So now, Winston Lum is the owner of three properties at 425 – 1st Street. That does him no good because he can't use those properties. . . . He just is on paper the owner of these properties. What he really wants is money . . . ."

With respect to the burglary charge, the prosecutor argued, "What crime is committed when you gain access to units? When your real purpose for gaining access is grand theft, is to steal money, it's called burglary. [¶] . . . Burglary has two elements. Defendants entered the building, and they entered with the intent to commit a crime. The crime in our case is grand theft. But in order to commit that grand theft, we know that they have to commit 115s, which are filing false or forged instruments because that's a step that they need to do before they get to the grand theft. [¶] We know that the way that they commit this crime, they are going to commit money laundering because as soon as money is put into an [*sic*] bank for an escrow, and the purpose of that money going to the bank is a grand theft, which is to steal it, that's right away money laundering." The prosecutor then told the jurors they were not required to agree on which crime the defendants intended to commit when they entered the condominium.

The jury instructions also pointed the jury to grand theft of the loan proceeds, not of the condominiums. The jury instructions on burglary named four possible target crimes: grand theft, filing forged or false documents, identity theft, and money laundering. These target offenses were not further defined within the instructions on burglary but the jury was instructed, "[t]o decide whether the defendant intended to commit Grand Theft, Filing Forged or False Documents, Identity Theft, or Money

46

Laundering, please refer to the separate instructions that I'll give you on those crimes." The only instructions explaining the elements of grand theft addressed count 7,[36] which charged grand theft of currency from DeWitte Mortgage and Kitco Holdings. The jury was never instructed on grand theft of the condominiums because the trial court had dismissed count 2 before the case was submitted to the jury.

The only reasonable conclusion to be drawn from the above is that the jury understood the reference to grand theft as a target offense of the burglary to be grand theft of the loan proceeds. That the enhancement alleged in connection with the burglary count was section 12022.6, subdivision (a)(4), referring to a taking of more than $3.2 million, does not persuade us to the contrary. Appellant views the enhancement as proving the target offense of grand theft had to be grand theft of the condominiums, because the $3.2 value could only refer to the condominiums and the allegation referred to property of Hwang *and* Shigezane. But the enhancement addressed a different point than the target offenses of the burglary. The burglary instructions directed the jury to determine whether appellant entered the condominium with the *intent* to commit one of the specified crimes, not whether he in fact committed them. If the jury found appellant committed the offense of burglary, the enhancement allegation directed it to determine whether in committing the burglary—regardless of what offense jurors believed appellant intended to commit when he entered—appellant *actually* caused a loss of more than $3.2 million by taking the property of Hwang and Shigezane. There is no reason to believe the jury would have looked to the enhancement to identify which offense or offenses it believed appellant intended to commit when he entered Hwang's condominium. As we have said, the jury was specifically instructed to refer to the instructions defining each of the substantive crimes in determining whether appellant intended to commit any of the target offenses, and the only grand theft upon which the jury was instructed was grand theft of the loan proceeds. The validity of imposing the enhancement is a separate

---

[36] The jury was also instructed on attempted grand theft in connection with count 14, which charged attempted grand theft of currency from John Abd-El-Malek.

47

question, which we will address in the next section of this opinion. But the enhancement allegation does not undermine the validity of grand theft as a target offense.

At oral argument, appellant for the first time asserted that the jury was also improperly instructed it could rely on identity theft as the target offense of the burglary. The information charged only three target offenses—grand theft, filing false deeds, and money laundering. The trial court instructed that there were four target offenses, adding identity theft to the three stated in the information. Appellant argues that his burglary conviction was unconstitutionally obtained if even one juror voted for conviction based on the theory that he entered Hwang's condominium with the intent to commit identity theft. In support of this contention, he cites *De Jonge v. Oregon* (1937) 299 U.S. 353, 362 (*De Jonge*), for its statement that "[c]onviction upon a charge not made would be sheer denial of due process."

This quotation states an obvious and fundamental principle: " 'Both the Sixth Amendment of the federal Constitution and the due process guarantees of the state and federal Constitutions require that a criminal defendant receive notice of the charges adequate to give a meaningful opportunity to defend against them.' " (*People v. Seaton*[(2001)] 26 Cal.4th 598, 640.)" (*People v. Cole* (2004) 33 Cal.4th 1158, 1205.) But *De Jonge* has no bearing on the present case. The statement upon which appellant relies was an aside, part of the court's explanation that it had to accept the indictment as construed by the state's high court; the question before the court was the constitutionality of the statute under which the defendant was convicted as applied to the conduct with which he was charged.[37] And, in any event, appellant was not convicted "upon a charge

---

[37] In *De Jonge, supra,* 299 U.S. 353, the defendant challenged his conviction under Oregon's criminal syndicalism law. Charged with assisting in conducting a meeting called under the auspices of the Communist Party, "an organization advocating criminal syndicalism," his defense was that the meeting was public, orderly, and held for a lawful purpose, with no unlawful conduct taught or advocated. (*Id.* at pp. 357-358.) The Oregon Supreme Court construed the indictment as charging that the defendant assisted with a meeting of the Communist Party, which was unlawfully teaching and advocating criminal syndicalism, not that the defendant or the meeting he assisted with engaged in these activities. (*Id.* at p. 361.) This limited construction meant that the

48

not made." He was charged with and convicted of burglary. His claim is that the information did not specifically inform him that the felonious intent element of the offense could be satisfied by proof of intent to commit identity theft—that is, did not apprise him of one of the alternative theories upon which the jury could have based his conviction.

This claim is resolved by *People v. Holt* (1997) 15 Cal.4th 619 (*Holt*). The defendant was charged with murder, robbery, rape, sodomy and burglary. As to the burglary, the information alleged he entered the victim's residence with intent to commit " 'theft or a felony.' " (*Id.* at pp. 638-639, 671-672.) The trial court instructed the jury that the burglary could be based on intent to commit theft, rape or sodomy. (*Id.* at p. 672.) The defendant complained on appeal that the instruction unconstitutionally "expanded the charge of which he had notice and denied him the right to a fair trial." (*Ibid.*) Rejecting this claim, the *Holt* court noted that the defendant did not demur to the information: "The well-established rule is that failure to demur on the ground that a charging allegation is not sufficiently definite waives any objection to the sufficiency of the information." (*Ibid.*) The defendant also did not object to the jury instructions when they were proposed or given. (*Ibid.*) Following the "established rule" that " '[n]otice of the particular circumstances of the offense is given not by detailed pleading but by the transcript of the evidence before the committing magistrate . . . .' " (*Ibid.*, quoting *People v. Roberts* (1953) 40 Cal.2d 483, 486), the court held, "defendant had notice both from the evidence offered at the preliminary hearing and the other offenses charged in the information that an intent to commit any of those offenses might be relied upon as the

---

defendant was convicted based solely on participating in a meeting of the Communist Party, regardless of what was said or done at the meeting. (*Id.* at p. 362.)

The United States Supreme Court stated, "We must take the indictment as thus construed. Conviction upon a charge not made would be sheer denial of due process." (*De Jonge, supra,* 299 U.S. at p. 362.) The court went on to reverse the conviction, explaining that because "peaceable assembly for lawful discussion" and meetings for "peaceable political action" cannot be criminalized, the statute under which the defendant was convicted "as applied to the particular charge as defined by the state court is repugnant to the due process clause of the Fourteenth Amendment." (*Id.* at p. 365.)

49

predicate for burglary.  The record thus refutes defendant's claim that he was somehow prejudiced by the manner in which the information charged burglary." (*Holt*, at pp. 672-673.)

The same is true here.  Appellant knew from the information that he was charged with identity theft as well as grand theft, filing false deeds, and money laundering, and the date range alleged in the count charging identity theft (like those for the other target offenses) included the date of the burglary.  Moreover, appellant's defense was that he did not enter the condominium with the intent to commit *any* felony; he maintained he was duped by Niroula and believed Lum owned the condominium.  Given this defense, it is particularly difficult to see how he could have been prejudiced by "the manner in which the information charged burglary." (*Holt, supra,* 15 Cal.4th at p. 673.)

Appellant additionally argues that identity theft could not serve as the felonious intent for the burglary because the theft of Hwang's identity "had been accomplished" before the entry into Hwang's condominium.  Appellant views the count of identity theft as confined to the use of Hwang's name on the grant deeds purporting to transfer the condominiums to Lum that were recorded before the burglary, and this is the act the prosecutor focused upon in explaining the count to the jury.  The jury instructions, however, were not so limited.  The jury was instructed that the offense of identity theft, described by the court according to its statutory title, "unauthorized use of someone else's personal identifying information," consists of willfully obtaining someone else's personal identifying information and willfully using it for an unlawful purpose without the consent of the other person.  An "unlawful purpose includes unlawfully obtaining or attempting to obtain credit, goods, services or real property in the name of the other person without the consent of that person."  In focusing on the "theft" of Hwang's personal identifying information involved in forging her name on the grant deeds, appellant appears to lose sight of the fact that " '*it is the use of the identifying information for an unlawful purpose that completes the crime* and each separate use constitutes a new crime.' " (*People v. Johnson* (2012) 209 Cal.App.4th 800, 817, quoting *People v. Mitchell* (2008) 164 Cal.App.4th 442, 455.)  Hwang's name was used not only to record deeds purporting to

50

transfer Hwang's property to Lum but also to obtain the loan that the condominiums were used to secure. The loan company obtained the deeds purporting to transfer the properties from Hwang to Lum and also required the declaration that purported to offer Hwang's assurance that the transaction was legitimate. The loan application process was on-going at the time of the entry—the entry occurred during the appraisal arranged by the lender as part of that process. As the unauthorized use of Hwang's name and the entry itself were both integral parts of the loan application procedure, to say the offense of identity theft was complete before the entry into the condominium would be to artificially segment steps of a single continuous process.

## B.

Shah argues that the section 12022.6, subdivision (a)(4), enhancement on count 18 is invalid because nothing was taken during the burglary. Section 12022.6, subdivision (a), provides for sentence enhancements, the length of which depend on the value of the financial loss caused "[w]hen any person takes, damages, or destroys any property in the commission or attempted commission of a felony, with the intent to cause that taking, damage, or destruction." As relevant here, if "the loss exceeds three million two hundred thousand dollars ($3,200,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted, shall impose an additional term of four years." (§ 12022.6, subd. (a)(4).)[38]

The verdict returned by the jury found true the allegation that Shah "took, damaged, and destroyed" property of a value exceeding $3,200,000, "the property of Shirley Hwang and Michael Shigezane within the meaning of Penal Code section 12022.6, subdivision (a)(4)."

The trial court's instructions to the jury, however, spoke only in terms of "taking." The jury was instructed, "If you find a defendant guilty of the crimes charged in counts 1,

---

[38] The other subsections of section 12022.6, subdivision (a), provide for an additional term of one year if the loss exceeds $65,000 (§ 12022.6, subd. (a)(1)), an additional term of two years if the loss exceeds $200,000 (§ 12022.6, subd. (a)(2)), and an additional term of three years if the loss exceeds $1,300,000 (§ 12022.6, subd. (a)(3)).

3 or 18, or of attempting to commit those crimes, you then must decide whether the People have proved the additional allegation that the value of the property *taken* was more than $3,200,000. [¶] To prove this allegation the People must prove that: [¶] One: In the commission or attempted commission of the crime, the defendant *took* property; [¶] Two: When he acted he intended to *take* the property; [¶] And [¶] Three: The loss caused by the defendant's *taking* the property was greater than $3,200,000. [¶] The value of property is the fair market value of the property." (Italics added.)

Shah argues that the instructions to the jury permitted it to find the enhancement allegation true only on a theory that property of the specified value was *taken*, not that it was damaged or destroyed, but that this theory could not be valid in light of the court's acquittal on the grand theft charge in count 2. As described above, count 2 alleged grand theft of real property worth more than $3,200,000 from Hwang. Shah argues, as we understand it, that because the trial court found there was no taking of the property in granting the motion for acquittal on the charge of grand theft in count 2, there could be no "taking" of the property within the meaning of the section 12022.6 enhancement connected to the burglary charge.[39] He further argues that the enhancement cannot be sustained because no taking of the property occurred "in the commission or attempted commission of the crime" charged in count 18—that is, during the appraisal visit on February 14, upon which the burglary charge was based.

---

[39] Shah argues in his opening brief on appeal, "[T]he trial court found that there was no taking of Hwang's property in acquitting on [count 2]. Obviously, if the allegation of excess 'taking' of $ $3.2 million was not proven as to the grand theft charge in count 2, it could not be sustained as to the burglary charge in count 18." This statement is perplexing, as the trial court acquitted Shah on count 2 due to the absence of evidence of the substantive offense, burglary, without reference to the allegation of excess taking. In his reply brief, Shah states, "[g]iven that the trial court found that there was no taking of Hwang's property in acquitting on count 2, the § 12022.6(a)(2) allegation of excess 'taking' of $3.2 million dollars was not proven in the burglary context of count 18." This statement appears to clarify that Shah's point is to compare the "taking" of the condominiums in count 2 with a "taking" of those properties for purposes of the section 12022.6 enhancement.

The dismissal of count 2 does not resolve whether the evidence supported finding a taking within the meaning of section 12022.6, subdivision (a)(4).[40] The offense of theft of real property requires the owner's loss of both possession and title. (*Callan v. Superior Court*, *supra,* 204 Cal.App.2d at p. 668.) The "taking" necessary to establish theft of real property, therefore, must be of both possession and title. (*Id.* at p. 668.) The same requirements do not apply to section 12022.6.

"In determining the meaning of the word 'take' as used in section 12022.6, we follow the rule that '[c]ourts should first look to the plain dictionary meaning of the [word] . . . .' (*Rosenfield v. Superior Court* (1983) 143 Cal.App.3d 198, 202.) With

---

[40] Respondent urges that the dismissal of count 2 is irrelevant because, unlike theft (*In re Jesus O.* (2007) 40 Cal.4th 859, 867), section 12022.6 does not require an intent to permanently deprive the owner of the property. (*People v. Kellett* (1982) 134 Cal.App.3d 949, 958-959 (*Kellett*).) But the offense at issue in count 2 was grand theft of real property. While intent to permanently deprive the owner is an element of theft of personal property, it is not an element of theft of real property. (*Sanders, supra,* 67 Cal.App.4th at p. 1411; CALCRIM No. 1804 [theft by false pretenses]; CALCRIM No. 1800 [theft by larceny].)

Proof of theft of real property by false pretense "requires that the prosecution establish: (1) the defendant made a false pretense or representation; (2) he did so with intent to defraud the owner of the property; and (3) the owner was in fact defrauded. (§ 484, subd. (a); *Callan v. Superior Court* (1962) 204 Cal.App.2d 652, 668-669.) [¶] Further, the false pretense or representation must have materially influenced the owner to part with his property, even though the false pretense need not be the sole inducing cause. ([*Callan*], at p. 669, quoting *People v. Ashley* (1954) 42 Cal.2d 246, 259 . . . .)" (*Sanders, supra,* 67 Cal.App.4th at pp. 1411-1412.)

In dismissing count 2, the court discussed two missing elements: there were no false misrepresentations to Hwang or her agent that were relied upon and caused her to lose possession of the property, and Hwang did not in fact lose possession of the property. The court explained first that under California law there is no offense of theft of real property by larceny; larceny applies only to personal property. (§ 484; *Callan v. Superior Court, supra,* 204 Cal.App.2d at p. 668.) After noting that larceny requires at least a temporary taking of possession, which did not occur in this case ("Ms. Hwang was never deprived of possession of the property"), and asportation, which is impossible with real property, the court emphasized that there can be no theft of real property without a taking "effected by false pretense or representation." (*Sanders, supra,* 67 Cal.App.4th at pp. 1417-1418.) There was no discussion of intent to deprive the owner of property.

regard to section 12022.6, this has already been done: 'The dictionary definition of "take" is "to get into one's hands or into one's possession . . . ." (Webster's Third New Internat. Dict. (1961) p. 2329.)' ([*Kellett*], *supra*, 134 Cal.App.3d . . . at p. 959.) (*People v. Loera* (1984) 159 Cal.App.3d 992, 1001.) Courts are bound to construe section 12022.6 in accordance with the Legislature's intent in enacting the statute, which was to deter large-scale crime. (*Kellett,* at p. 959, *Loera,* at p. 1002.) Accordingly, courts have refused to construe the "taking" required under section 12022.6 restrictively. (*Loera,* at p. 1002; *People v. Superior Court* (*Kizer*) (1984) 155 Cal.App.3d 932, 935.) "[S]ection 12022.6 is applicable 'without regard for the duration of the dispossession' ([*Kellett*], at p. 960; see *People v. Bates* (1980) 113 Cal.App.3d 481, 483-484) or for 'the victim's ultimate out-of-pocket loss.' (See *People v. Ramirez* (1980) 109 Cal.App.3d 529, 539.)" (*Loera*, at p. 1000.) The enhancement applies, for example, when stolen property is immediately recovered by police interruption of a crime in progress. (*Bates,* at pp. 483-484.)

Looking at the defendants' scheme as a whole, it is clear that although Hwang did not lose possession of her properties, she did lose their value: As the trial court recognized,[41] until she was able to regain clear title, she was deprived of the economic

---

[41] In discussing the section 12022.6, subdivision (a)(4), enhancement connected to the conspiracy count in the context of Shah's motion for judgment of acquittal (§ 1118.1), the trial court rejected the argument that the measure of loss was limited to the amount of the loan proceeds and did not include the value of the real property. The court explained that the value of the real property "is what the loss was to Ms. Hwang during the time that the false deed was recorded against her property and the deeds of trust were recorded against her property; until those recorded instruments were removed she was harmed and lost the full value and use and control of her real property. [¶] She . . . was unable to, as the rightful owner of that property, handle it, manage it, control it, use it, in the . . . full way that she as a fee title owner should have been able to use that property."

Turning to the burglary count, Shah argued that there was no taking in the commission of the offense because the burglary was complete as soon as there was an entry and no taking was "inextricably wound up with the active entry." By contrast, Shah recognized that a taking with respect to the offenses of filing false deeds would have occurred "in the commission" of the offense because in that context the taking "is inextricably wound up in the filing of those false documents." The court rejected that

54

use of her properties. (See *People v. Denman* (2013) 218 Cal.App.4th 800, 811 [true owners unable to sell properties due to cloud on title from fraudulent deeds].) Looked at conversely, although Shah and his confederates did not effect an actual theft of the properties, they "took" Hwang's properties by fraudulently assuming ownership of them and using them to obtain funds from the lender, thereby "taking" them from Hwang in the sense that she lost the ability to make economic use of them while Shah and his confederates exercised powers with respect to the properties that legally belong only to an owner.[42] The burglary was an integral step in this overall scheme, a necessary predicate to obtaining the loan secured by the properties. When they entered the unit with the appraiser, Shah and Niroula temporarily got the property "into [their] hands or into [their] possession" (*Kellett, supra,* 134 Cal.App.3d at p. 959) and accomplished one of the necessary steps in a continuous process of obtaining a loan secured by the property. This was a "taking" consistent with the broad definition of the term "take" and the legislative purpose of deterring large-scale crime.

## C.

Shah's final argument in connection with the burglary conviction is that the trial court violated section 654 by sentencing him to an aggravated term for the burglary and also imposing the excessive takings enhancement. According to Shah, the court imposed the aggravated term on the burglary mainly because Shah took, or caused the loss of, millions of dollars, and doing so in addition to imposing the excessive takings

reasoning in favor of the same analysis applied to the conspiracy count, stating that the entry was for the purpose of grand theft, filing of false deeds and money laundering—that is, for the purpose of the entire criminal scheme.

[42] In *People v. Denman, supra,* 218 Cal.App.4th at page 811, as here, the defendant argued he could not "take" the properties for which he filed fraudulent quitclaim deeds because he had no title or interest in them. The court did not directly address this contention because the prosecution's theory in that case was that the defendant "damaged" the properties by clouding title. Noting the dictionary definition of "damage"—" 'loss or harm resulting from injury to person, property, or reputation' "— the *Denman* court held that "by not being able to sell their properties because of the cloud on title, each of the victims suffered loss of the assessed value of their property." (*Ibid.*, quoting Webster's 9th New Collegiate Dict. (1991) p. 323.)

enhancement violated the prohibition against double punishment. He asks us to remand for reconsideration of the imposition of the aggravated term.

Section 654 provides, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

The court selected burglary as the principal term because, with its enhancement, this offense carried the greatest term of imprisonment. (§ 1170.1, subd. (a).) In explaining its reasons for imposing an aggravated term, the court found a number of aggravating factors relating to the crime (Cal. Rules of Court, rule 4.421(a)): The crime "involved great bodily harm" to the victims and showed "a high degree of . . . callousness"; Shah's acts "caused Hwang to lose the ability to have and control her real property for years and caused the loss of millions of dollars"; his acts "also victimized the DeWittes, who made loans in the amount of $2.2 million as a direct result of the fantastical web of lies or fraud orchestrated by Shah"; Shah "induced others to participate in the crime and occupied a position of leadership in the commission of the crime"; the "manner in which the crime was carried out indicates planning, sophistication, and professionalism"; "[t]he crime involved an attempted taking as well as an actual taking of great monetary value"; "[t]he evidence showed, and the jury so found, that Shah masterminded an audacious scheme of fraud, lies, and false identities; his scheme exploited the good will of his business associates and friends, such as Nga Tran and John Flores and Michael Hartshorn"; Shah "insinuated himself into the fabric of other people's lives with complete disregard and disdain for the ruin in their lives caused by his greed" and "showed complete disregard for what his actions might do to Shirley Hwang, Michael Shigezane, Peter DeWitte, and their families"; "[w]ith cold-hearted cunning, he used the financials of a murdered man, changing the name to be that of Mr. Lum, as support for the fraudulent loan applications"; and "[h]is complete disregard and disdain for the law is optimized by one of the names he chose for his magicJack account: 'Dumb Cops.' " The court found no mitigating circumstances. It specifically declined to

consider Shah's physical disability as a mitigating factor, noting that Shah had the disability when he committed the crimes, his criminal history showed he had been in custody previously and he "knew what incarceration would mean for him with his disability when he committed these crimes," and the Department of Corrections has two hospitals equipped to "fully address any medical condition."[43]

The court's discussion of aggravating factors makes clear that the monetary value of the loss Shah's offense caused was far from the sole basis for imposition of the aggravated term. The court's predominant focus was on the nature of Shah's criminal conduct, his disregard for and exploitation of other people and his disdain for the law. We find no violation of section 654 and no basis for remand to reconsider imposition of the aggravated term.

## IV.

Shah's next argument concerns the sentence on his three convictions for money laundering. Section 12022.6, subdivision (a)(2), calls for an additional term of two years if the loss caused by the taking, damaging or destruction of property in the commission of the underlying felony exceeds $200,000. In addition to consecutive one-third middle terms of eight months for each of Shah's money laundering convictions, the court imposed one-third terms of eight months for each of the three section 12022.6, subdivision (a)(2), enhancements, as well as a three-year term for the money laundering enhancement specified in section 186.10, subdivision (c)(1)(C).[44]

---

[43] In explaining its sentence on other counts, the court additionally noted that Shah's prior convictions were numerous and of increasing seriousness, and that the crimes were committed at different times and places.

[44] Section 186.10, subdivision (a), defines the elements of and punishment for the crime of money laundering: "(a) Any person who conducts or attempts to conduct a transaction or more than one transaction within a seven-day period involving a monetary instrument or instruments of a total value exceeding five thousand dollars ($5,000), or a total value exceeding twenty-five thousand dollars ($25,000) within a 30-day period, through one or more financial institutions (1) with the specific intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any criminal activity, or (2) knowing that the monetary instrument represents the

Shah contends that the section 12022.6, subdivision (a)(2), enhancements must be vacated for several reasons.  First, he argues that these enhancements address the same funds that were aggregated to form the basis of the section 186.10, subdivision (c), enhancement, so that imposing punishment under both statutes violates the proscription against double punishment in section 654.  Second, Shah urges that the three 12022.6 enhancements apply only where a defendant "takes, damages, or destroys" property of the specified value "in the commission or attempted commission of a felony. . . ."  The offense of money laundering, he maintains, does not necessarily involve taking, damaging, or destroying property; it requires only that the defendant conduct or attempt to conduct transactions involving a specified amount of money over a specified time period "with the specific intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any criminal activity" or "knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity."  (§ 186.10, subd. (a).)  Third, Shah

---

proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity, is guilty of the crime of money laundering."

Subdivision (c)(1), of section 186.10, provides for sentence enhancements depending on the value of the offending transactions:

"Any person who is punished under subdivision (a) by imprisonment pursuant to subdivision (h) of Section 1170 shall also be subject to an additional term of imprisonment pursuant to subdivision (h) of Section 1170 as follows:

"(A)  If the value of the transaction or transactions exceeds fifty thousand dollars ($50,000) but is less than one hundred fifty thousand dollars ($150,000), the court, in addition to and consecutive to the felony punishment otherwise imposed pursuant to this section, shall impose an additional term of imprisonment of one year.

"(B)  If the value of the transaction or transactions exceeds one hundred fifty thousand dollars ($150,000) but is less than one million dollars ($1,000,000), the court, in addition to and consecutive to the felony punishment otherwise imposed pursuant to this section, shall impose an additional term of imprisonment of two years.

"(C)  If the value of the transaction or transactions exceeds one million dollars ($1,000,000), but is less than two million five hundred thousand dollars ($2,500,000), the court, in addition to and consecutive to the felony punishment otherwise imposed pursuant to this section, shall impose an additional term of imprisonment of three years."

58

argues that the taking of the funds at issue in the money laundering counts—the funds from the loan—had been completed before the laundering began.

Respondent urges that there was no violation of section 654 in sentencing on both the section 12022.6, subdivision (a), enhancements and the section 186.10, subdivision (c), enhancement because the Legislature, in section 12022.6, subdivision (a)(2), evinced its intent to override the section 654 prohibition. The Legislature has the "power to override section 654 in specific circumstances by enactments that do not cite the statute explicitly." (*People v. Benson* (1998) 18 Cal.4th 24, 33.)

The language respondent relies upon is the provision in section 12022.6, subdivision (a), that if the loss exceeds $200,000, "the court, *in addition and consecutive to the punishment prescribed for the felony* or attempted felony of which the defendant has been convicted, shall impose an additional term of two years." (Italics added.) This language directs that the two-year term specified in section 12022.6, subdivision (a)(2), be imposed in addition to the underlying felony—in this instance, money laundering in violation of section 186.10, subdivision (a). This point, however, does not address appellant's argument. Section 186.10 defines both the substantive offense of money laundering, in subdivision (a), and, in subdivision (c), enhancements for that offense depending on the value of the illegal transactions. Appellant's contention is that the trial court violated the prohibition against multiple punishment by imposing sentence on both the section 12022.6, subdivision (a), enhancements and the *enhancement* specified in section 186.10, *subdivision (c).*

"When applied to multiple enhancements for a single crime, section 654 bars multiple punishment for the same *aspect* of a criminal act." (*People v. Ahmed* (2011) 53 Cal.4th 156, 164.) Section 12022.6, subdivision (a)(2), provides for a sentence enhancement when the loss caused by a felony exceeds $200,000. Section 186.10, subdivision (c)(1)(C), provides for a sentence enhancement when the offense of money laundering involves transactions with a value exceeding $1,000,000 but less than $2,500,000. In the present case, both enhancement statutes address precisely the same aspect of the criminal offenses—the financial value of the transactions constituting

59

money laundering. Nothing in either section 12022.6, subdivision (a), or section 186.10, subdivision (c), suggests that the Legislature intended an exception to section 654 in these circumstances. The sentence imposed on the section 12022.6, subdivision (a), enhancements must be stricken.[45]

Respondent fails to address in any meaningful way Shah's argument that the section 12022.6, subdivision (a)(2), enhancements themselves cannot stand because no property of the requisite value was "taken, damaged, or destroyed" in the commission of the money laundering offenses. Respondent's purported answer simply states, with citations to the jury's verdicts on the money laundering counts, that the jury "supplied" the elements Shah claims lacked proof: "[t]hat Shah had taken, damaged, or destroyed property exceeding $200,000 in value in conjunction with each of the money laundering charges." The fact that the jury recorded its findings on a verdict form stating the elements of the enhancement does nothing to explain what evidence supported these findings.

The jury was instructed that in order to prove the counts of money laundering, the prosecution was required to prove that the defendant "conducted or attempted to conduct one or more financial transactions involving at least one monetary instrument through at least one financial institution"; the defendant "conducted or attempted to conduct the financial transactions within a seven-day period and the monetary instruments had a total value of more than $5,000"; or the defendant "conducted or attempted to conduct the financial transactions within a 30-day period and the monetary instruments had a total value of more than $25,000"; and "[w]hen the defendant did so, he intended to promote or [manage] or establish or carry on or facilitate criminal activity." (§ 186.10, subd. (a); CALCRIM No. 2997.) The relevant conduct could include initiating, participating in or concluding transactions such as deposits to, withdrawals from, and transfers between accounts in a financial institution. (§ 186.9; CALCRIM No. 2997.)

_____

[45] In light of this conclusion, we need not address the argument that the section 12022.6, subdivision (a), enhancements were invalid because no property was "taken" in the commission of money laundering.

60

Here, the money laundering counts were based on financial transactions occurring on or about three dates in 2009, March 6 (count 11), March 9 (count 12) and April 20 (count 13). March 6 was the date the funds deposited by the lenders into escrow were received into Tran's escrow account. The prosecutor told the jury that the transfer of $1.7 million into Tran's escrow account constituted the money laundering charged in count 11. For count 12, the prosecutor argued, the money laundering consisted of checks written by Shah and Emerich in the seven days before and after March 9, totaling $20,000, and the $225,000 deposited into Lum's bank account on March 9. Count 13 was based on transactions totaling $5,000 through Martini & Chnoogle's bank account, and an $8,000 withdrawal by Lum.

As with the section 12022.6, subdivision (a)(4), enhancement discussed previously, the instructions on the section 12022.6, subdivision (a)(2), enhancements referred only to a "taking" in the commission of the underlying felony, not to "damaging" or "destroying." And, as also discussed, the dictionary definition of "take" is " 'to get into one's hands or into one's possession . . . .' " (*People v. Loera, supra,* 159 Cal.App.3d at p. 1001, quoting *Kellett, supra,* 134 Cal.App.3d at p. 959.)

Shah is correct that the offense of money laundering does not have a "taking" element; the offense consists of specified use of monetary instruments with specified intent without reference to the source of the funds being used. But this point does not advance his argument, because elements of the offense underlying a section 12022.6 enhancement do not determine the applicability of the enhancement. (*Kellett, supra,* 134 Cal.App.3d at p. 958.) "In enacting section 12022.6, the Legislature did not intend that a taking was to be a necessary element of the underlying crime in order to impose the enhancement. (See Cassou and Taugher, *Determinate Sentencing in California: The New Numbers Game* (1978) 9 Pacific L.J. 5, 45.) . . . The Legislature was not concerned with the crime committed by a defendant so long as property valued in excess of $25,000 was taken." (*Kellett, supra,* 134 Cal.App.3d at p. 958.)

Shah's more persuasive contention is that there was no evidentiary support for the section 12022.6, subdivision (a)(2), enhancements because there was no evidence Shah

61

took, damaged, or destroyed anything while engaged in money laundering. As to counts 12 and 13, this is clearly correct: These counts involved the use of monies that previously had been transferred from the lenders to Lum. As the transfer had been completed before the March 9 and April 20 transactions underlying these counts, the money laundering involved no "taking"; the money was already effectively in the defendants' hands.

Count 11 is different. This count, according to the prosecutor, was based on the March 6 transfer of funds into Tran's escrow account. The funds at issue had been deposited by the lenders into an escrow account. Had this been a legal transaction, the money would have belonged to the lenders until all conditions of the escrow were fully performed, at which point it would legally "belong" to the borrower. (See *Todd v. Vestermark* (1956) 145 Cal.App.2d 374, 377.) The "taking" would occur at the point the escrow conditions were fulfilled and the borrower's rights to the funds established. (*Ibid.*)[46] By analogy, here, a taking occurred when the lenders lost control of the funds and the funds came into the defendants' control.

---

[46] The question in *Todd v. Vestermark, supra,* 145 Cal.App.2d 374, was which party had to bear the loss when an escrow holder embezzled the escrow funds. The court explained, "The escrow holder is agent for both parties at all times prior to performance of the conditions of the escrow, but when that event transpires '. . . the nature of this dual agency changes to an agency not for both, but for each of the parties to said transaction in respect to those things placed in escrow to which each has thus become completely entitled.' (*Shreeves v. Pearson, supra,* 194 Cal. 699, 707; see also, *Greenzweight v. Title Guar. & Trust Co.* [(1934)] 1 Cal.2d 577, 582.) When the conditions have been fully performed, title passes *eo instanti* and recordation of documents operates to evidence the passing of title previously accomplished. (18 Cal.Jur.2d § 24, p. 341, § 14, p. 325; *Holman v. Toten* [(1942)] 54 Cal.App.2d 309, 313-314.) On the other hand, a delivery or recordation by or on behalf of the escrow holder prior to full performance of the terms of the escrow is a nullity. No title passes. (*Hildebrand v. Beck* [(1925)] 196 Cal. 141, 147; *Greenzweight*[, at p.] 581; *Drinkwater v. Hollar* [(1907)] 6 Cal.App. 117, 121; see also 30 C.J.S. § 11, p. 1211.) If the escrow holder embezzles funds deposited in the escrow and does so before the moment for closing arrives, the loss must be borne by him who deposited it, because it is still his money. (*Hildebrand*[, at p.] 146; 18 Cal.Jur.2d § 18, p. 331.)" (*Todd v. Vestermark,* at p. 374.)

Shah argues that the "taking" occurred when the funds passed from the Commonwealth escrow account to the Tran escrow, when appellant assumed control over (or "power to dispense") the money. This is the same event the prosecutor identified as the basis for the money laundering charge in count 11. Appellant, however, maintains that the transfer into the Tran account occurred on March 5 and therefore could not have constituted a taking "in the commission of" the money laundering on March 6. The evidence thus demonstrates that the taking of the loan proceeds was simultaneous with— and therefore occurred "in the commission of"—the money laundering charged in count 11.

We conclude that the section 12022.6, subdivision (a)(2), enhancement was supported as to count 11—although, as we have explained, the sentence imposed on this enhancement cannot stand. The section 12022.6, subdivision (a)(2), enhancements on counts 12 and 13 must be stricken in their entirety.

## V.

Shah further contends the enhancement under section 186.11, subdivision (a)(2), is invalid. Section 186.11, subdivision (a)(1), defines the "aggravated white collar crime enhancement": "Any person who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than one hundred thousand dollars ($100,000), shall be punished, upon conviction of two or more felonies in a single criminal proceeding, in addition and consecutive to the punishment prescribed for the felony offenses of which he or she has been convicted, by an additional term of imprisonment in the state prison as specified in paragraph (2) or (3). This enhancement shall be known as the aggravated white collar crime enhancement. The aggravated white collar crime enhancement shall only be imposed once in a single criminal proceeding. For purposes of this section, 'pattern of related felony conduct' means engaging in at least two felonies that have the same or similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are

63

not isolated events. For purposes of this section, 'two or more related felonies' means felonies committed against two or more separate victims, or against the same victim on two or more separate occasions."

Subdivision (a)(2) of section 186.11 specifies that "[i]f the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than five hundred thousand dollars ($500,000), the additional term of punishment shall be two, three, or five years in the state prison."

Shah argues that the evidence is insufficient to support this enhancement because it showed no "pattern" in that the offenses here were committed as part of a "unitary scheme" to steal the $2.1 million loan proceeds. In Shah's view, there might be a "pattern" within the meaning of the enhancement if the defendants had been convicted of "fleecing" additional loan companies by similar methods. He cites several cases as examples of section 186.11 "typically" being applied in cases where defendants have operated large-scale frauds involving multiple victims of a scheme which extends for a significant time period. (*People v. Williams* (2004) 118 Cal.App.4th 735, 747 [multiple convictions of grand theft and making false statements in connection with sale of a security, arising from Ponzi scheme with multiple investor/victims]; *People v. Petronella* (2013) 218 Cal.App.4th 945, 961 [multiple convictions for fraudulent statements in connection with workers' compensation premiums]; *People v. Mozes* (2011) 192 Cal.App.4th 1124, 1129 [multiple counts of theft by false pretenses in connection with prospective adoptions].)

By its express terms, section 186.11 does not require proof of offenses against multiple victims: The "two or more related felonies" may be "committed against two or more separate victims, or against the same victim on two or more separate occasions." (§ 186.11, subd. (a)(1).) Nor is there a requirement that the same felony or felonies be repeated multiple times: The statute applies to two or more "related" felonies that have "the same or similar purpose." (*Ibid.*) Nothing in the language of the statute suggests it does not apply where multiple felonies that otherwise meet the statutory definitions are committed pursuant to a singular overarching scheme.

64

"The purpose of the aggravated white collar crime enhancement was to provide a mechanism for greater punishment for criminals who engage in a pattern of fraudulent activity that results in a large amount of accumulated takings." (*People v. Williams, supra,* 118 Cal.App.4th at p. 747.) Here, Shah was convicted of well more than the minimum of two felonies with a material element of fraud. All had the "same or similar purpose, result, principals, . . . [and] victims," and were "not isolated events." According to the express statutory definition, this was a "pattern of related felony conduct." (§ 186.11, subd. (a)(1).)

## VI.

Shah's final contention is that the imposition of a $14 million restitution fine violated his Sixth Amendment right to a jury trial.

Section 186.11, subdivision (c), provides that "[a]ny person convicted of two or more felonies, as specified in subdivision (a), shall also be liable for a fine not to exceed five hundred thousand dollars ($500,000) or double the value of the taking, whichever is greater, if the existence of facts that would make the person subject to the aggravated white collar crime enhancement have been admitted or found to be true by the trier of fact."

The prosecution asked the court to impose a fine of $14.12 million, stating that the value of Hwang's property that Shah encumbered was $4.85 million and the value of the loan was $2.21 million. Although Shah notes that the court imposed a fine of $14.10 without explaining how it arrived at that figure, the explanation is obvious. According to the undisputed evidence at trial, the combined value of the three condominiums was $4.85 million and the loan was $2.2 million.[47] The sum of each of these figures, doubled pursuant to section 186.11, subdivision (c), is $14.1 million.

---

[47] Respondent asserts the fine was miscalculated in that Simms, the appraiser, estimated the value of the condominiums as $4,625,000 rather than the $4,850,000 found by the court. This is incorrect. Simms testified that he appraised unit 4802 at $1,225,000, unit 4902 at $1,225,000, and unit 5501 at $2,400,000. The sum of these figures is $4,850,000.

Shah argues that under *Southern Union Co. v. United States* (2012) ___ U.S. ___, 132 S.Ct. 2344, the fine could not be imposed because there was no jury finding as to the amount of loss caused by Shah's conduct. *Southern Union* held that the rule of *Apprendi v. New Jersey* (2000) 530 U.S. 466—"any fact, other than the fact of a prior conviction, that increases a criminal defendant's maximum potential sentence" must be found by a jury—applies to the imposition of criminal fines. (*Southern Union*, at pp. 2348-2349.)

*Apprendi* error is subject to harmless error analysis. (*People v. Wilson* (2013) 219 Cal.App.4th 500, 518-519.) " 'Failure to submit a sentencing factor to the jury, like failure to submit an element to the jury, is not structural error.' (*Washington v. Recuenco* (2006) 548 U.S. 212, 222.) 'Such an error does not require reversal if the reviewing court determines it was harmless beyond a reasonable doubt, applying the test set forth in *Chapman v. California* (1967) 386 U.S. 18.' (*People v. French* [(2008)] 43 Cal.4th [36,] 52–53.) . . . 'The failure to submit a sentencing factor to a jury may be found harmless if the evidence supporting that factor is overwhelming and uncontested, and there is no "evidence that could rationally lead to a contrary finding." ' (*French, supra,* at p. 53.)" (*Wilson,* at pp. 518-519.)

Here, the evidence concerning the financial value of the loss caused by Shah's criminal conduct was clear and undisputed. There was no evidence that could rationally have led to a finding of value other than that employed by the court in calculating the amount of Shah's fine.

## VII.

Lum argues that the trial court abused its discretion in refusing to admit evidence that he told investigating officers he believed Niroula owned the Rincon properties. At trial, Lum's attorney did not offer specific statements he sought to have admitted; the discussions and ruling addressed "general statements" in which Lum told the officers he was to be provided a job by Niroula and he believed Niroula owned the Rincon properties.[48] Lum argues that the proposed evidence was not offered for the truth of the

---

[48] In the trial court, Lum's attorney described the statements as ones "in which [Lum] indicated that he expected that he would receive a job and otherwise be provided

66

matters stated—that Niroula in fact owned the properties or offered Lum a job—but to show Lum's state of mind.[49]  The point was to suggest that Lum acted only to help Niroula and without fraudulent intent.

The hearsay rule makes inadmissible "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."  (Evid. Code, § 1200.)

As the trial court stressed, in seeking to have a police officer testify to what Lum said in the interview, Lum was attempting to introduce double hearsay—what Lum said Niroula (or Shah) had said to Lum.  The truth of what Niroula might have said was not at issue.  But the truth of what Lum said to the officer clearly was:  In eliciting the officer's testimony that Lum said he did what he did in exchange for a job Niroula offered him, or that Lum said he believed Niroula owned the properties, Lum's defense would have been attempting to establish the truth of the matters Lum stated—that Lum in fact acted in the belief that Niroula owned the properties and in fact believed Niroula offered him a job in exchange for his help.  As the trial court explained, "it's not the effect of the statement of

---

benefits by [Niroula] in connection with the—his accommodation for assisting him in obtaining title to a property he believed Niroula rightfully owned."  In a written motion, counsel stated that the statements involved Niroula's reason for needing Lum's help with the properties and what Lum would receive in return.

[49] At the preliminary hearing, Police Inspector Gregory Ovanessian testified that in a postarrest interview, Lum said that Niroula had approached him in the San Francisco County jail and proposed to give him a large sum of money in exchange for Lum's help with this case.  Lum related that Niroula told him he owned the Rincon properties but, as a foreign national, had difficulty holding title.  Niroula was going out of the country for cancer treatment and wanted to use Lum's name on the grant deeds and loan applications.  Niroula said Hwang was his girlfriend and also promised Lum a job at the Sundowner motel.  Inspector Robert Steger, who participated in the interview, testified that Lum told him about signing documents at a café with Niroula, an attorney, and Shah present.  Lum said that Niroula was in trouble, something about a divorce, and wanted to transfer property from himself to Lum on a short-term basis, and that they were going to get a loan in Lum's name although the loan was not for Lum.  Lum said that he received $180,000 from the loan proceeds, and that Shah told him he could use some of the money for his expenses but he was not to withdraw more than $10,000 on any given day.  Lum said he believed Hwang was Niroula's wife.

67

Niroula to Lum where Lum is talking about his state of mind when he heard these statements that would make it come in, it's a double hearsay, because it's Ovanessian's understanding of what Lum was telling him, which is Lum's understanding, presumably, of what Niroula was telling him. [¶] And that would come in for the truth of the matter."

At trial, when Lum's attorney sought to ask Inspector Ovanessian "very limited" questions about Lum's state of mind as reflected in the interview after his arrest, the court ruled there was insufficient foundation for admission because the officer's opinion about what Lum said was irrelevant as to Lum's state of mind and the statement was "self-serving" in the sense of lacking foundational reliability. The court subsequently reaffirmed this ruling in denying a formal motion to question Ovanessian about Lum's statements, finding them inadmissible because they were offered for the truth of the matter stated (Evid. Code, § 1250, subd. (b)) and were made in circumstances indicating a lack of trustworthiness (Evid. Code, § 1252).

Lum's attorney was able to elicit testimony on cross examination of Inspector Steger, who participated in the postarrest interview, that Lum acknowledged receiving money (although he said he received $180,000 rather than $225,000) and explained his understanding about why he had received it, but was not permitted to relate what Lum said about the reason or to answer questions about whether he "investigated" Lum's beliefs about the reason. Steger did testify that he found no evidence Lum had an agreement with Niroula to receive any specific sum of money.

Evidence Code section 1250 provides that, subject to Evidence Code section 1252, "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule" when the evidence "is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action" or "to prove or explain acts or conduct of the declarant." Evidence Code section 1250 "does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed." (Evid. Code, § 1250, subd. (b).)

68

Evidence Code section 1250 "is subject to Evidence Code section 1252, which provides, 'Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness.' 'The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception. Such an endeavor allows, in fact demands, the exercise of discretion.' (*People v. Gordon* (1990) 50 Cal.3d 1223, 1251 [interpreting Evid. Code, § 1230].) A reviewing court may overturn the trial court's finding regarding trustworthiness only if there is an abuse of discretion. (*Id.* at pp. 1250-1251; *People v. Frierson* (1991) 53 Cal.3d 730, 745.)" (*People v. Edwards* (1991) 54 Cal.3d 787, 819-820 (*Edwards*).)

In *Edwards,* when interviewed upon arrest nine days after a murder, the defendant cried, claimed not to remember anything about the shooting, complained of headaches and mentioned a notebook in which, between the shooting and the arrest, he had referred to having headaches and feeling sick, and apparently referred to himself in the third person. (*Edwards*, *supra*, 54 Cal.3d at p. 818.) At trial, he sought to introduce the notebook and the taped interview into evidence without testifying himself. (*Ibid.*) The trial court found the statements inadmissible because they were not made in circumstances indicating trustworthiness and the defendant's attempt to introduce the evidence without testifying or presenting psychiatric evidence was an attempt to present a defense without subjecting the defendant to cross examination. (*Id.* at p. 819.)

Upholding the trial court, and rejecting the defendant's claim that the statements were admissible under Evidence Code section 1250, *Edwards* explained, " 'A defendant in a criminal case may not introduce hearsay evidence for the purpose of testifying while avoiding cross-examination.' (*People v. Harris* (1984) 36 Cal.3d 36, 69 (plur. opn. by Broussard, J.).) That rule applies here. To be admissible under Evidence Code section 1252, statements must be made in a natural manner, and not under circumstances of suspicion, so that they carry the probability of trustworthiness. Such declarations are admissible only when they are ' "made at a time when there was no motive to deceive." '

69

(*People v. Howard* (1988) 44 Cal.3d 375, 405, quoting 6 Wigmore, Evidence (3d ed. 1940) § 1730, p. 94; see also *People v. Milner* (1988) 45 Cal.3d 227, 248-249.)

"When defendant made the statements, nine days had elapsed since the shooting. He knew he had killed one 12-year-old girl and had wounded a second. He had a compelling motive to deceive and seek to exonerate himself from, or at least to minimize his responsibility for, the shootings. There was 'ample ground to suspect defendant's motives and sincerity' when he made the statements. (*People v. Whitt* (1990) 51 Cal.3d 620, 643.) The need for cross-examination is especially strong in this situation, and fully warrants exclusion of the hearsay evidence. (See also *People v. Kaurish* (1990) 52 Cal.3d 648, 704-705 [self-serving statement tape-recorded shortly after the defendant's arrest properly excluded as inadmissible hearsay]; *People v. Cruz* (1968) 264 Cal.App.2d 350, 356-360 [same].)" (*Edwards, supra,* 54 Cal.3d at p. 820.)

Similarly, in *People v. Vasquez* (2012) 205 Cal.App.4th 609, 624, which the trial court cited in connection with its finding that certain statements by other participants in the scheme were not admissible as declarations against interest, a statement made during police interrogation after arrest, with knowledge that the police were investigating a crime in which the declarant's car had been involved, was viewed as untrustworthy because "[t]he usual motive to minimize responsibility and curry favor appears to have been in full effect here."

So, here, the trial court found that the circumstances were "just not trustworthy" because the statements were made after Lum was arrested and Lum's "natural inclination at that point would be to minimize or explain or excuse or deny his own involvement in any criminal activity, and to try to explain it away." Lum argues that, unlike the case in *Edwards,* there was no evidence he had a compelling motive to lie to the police, that he had every motive and reason to tell the truth about how and why he signed the deeds, to cooperate with the police and help them identify the primary wrong-doers, and there was no evidence suggesting his belief that Niroula owned the properties was anything other than sincere. The argument is not persuasive. Lum was under arrest for involvement in a fraudulent scheme based on the recording of false deeds in his name and their use as

70

collateral for a loan obtained in his name, and had received and spent a considerable amount of money from the loan. There was " 'ample ground to suspect defendant's motives and sincerity' when he made the statements," and clear need for cross examination concerning the mental state with which he acted. (*Edwards, supra,* 54 Cal.3d at p. 820.)

Arguing that the police inspectors believed him, Lum stresses that when asked at the preliminary hearing whether Lum believed that Niroula was the true owner of the Rincon properties, Inspector Steger responded, "He was under that impression, clearly." The officer's assessment of Lum's credibility does not alter the fact that Lum's out-of-court statements were made in circumstances indicating a lack of trustworthiness. The trial court did not abuse its discretion.

## VIII.

Lum also contends there was insufficient evidence to support his conviction of attempted grand theft (count 14) and the related excessive takings enhancement. This conviction involved the attempted sale of one of the Rincon units by Lum, as described by the testimony of real estate agent Alden and her client, Abd-El-Malek. Lum argues that his conviction must be reversed because there was no evidence of any act taken toward commission of grand theft.

"[A]s provided by section 21a, '[a]n attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission.' " (*People v. Toledo* (2001) 26 Cal.4th 221, 229.) "The overt act element of attempt requires conduct that goes beyond 'mere preparation' and 'show[s] that [defendant] is putting his or her plan into action.' (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 8; see, e.g., [*Toledo*, at p.] 230 ['Under the provisions of section 21a, a defendant properly may be found guilty of [an attempt crime] whenever, acting with the specific intent to commit the offense . . . , the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action']; see also CALJIC No. 6.00 [mere preparation . . . is not sufficient to constitute an attempt] CALCRIM No. 460 [requiring a 'direct step' that 'goes beyond planning or

71

preparation and shows that a person is putting his or her plan into action'].)" (*People v. Watkins* (2012) 55 Cal.4th 999, 1021.) " 'The preparation consists in devising or arranging the means or measures necessary for the commission of the offense; the attempt is the direct movement toward the commission after the preparations are made.' (*People v. Murray* (1859) 14 Cal. 159; see also *People v. Anderson* (1934) 1 Cal.2d 687, 689–690, 37 P.2d 67.)" (*Decker*, at p. 8 .)

Our Supreme Court has remarked that "the line between mere preparation and conduct satisfying the act element of attempt often is difficult to determine; the problem 'is a question of degree and depends upon the facts and circumstances of a particular case.' [Citation.] The act that goes 'beyond mere preparation' need not constitute an element of the target crime (*People v. Dillon* (1983) 34 Cal.3d 441, 453–454 (*Dillon* )), and it ' "need not be the ultimate step toward the consummation of the design." ' (*People v. Memro* (1985) 38 Cal.3d 658, 698.) Instead, ' "it is sufficient if [the conduct] is the first or some subsequent act directed towards that end after the preparations are made." ' (*Ibid.*)" (*People v. Watkins, supra,* 55 Cal.4th at p. 1021.)

In further defining the direct act requirement, the court has stated that " 'there must be some appreciable fragment of the crime committed, it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter.' " (*Dillon, supra,* 34 Cal.3d at p. 454, quoting *People v. Buffum* (1953) 40 Cal.2d 709, 718.) The "fragment of the crime" reference, the court explained, "is simply a restatement of the requirement of an overt act directed towards immediate consummation." (*Dillon*, at p. 454.) The "reference to interruption by independent circumstances rather than the will of the offender merely clarifies the requirement *that the act be unequivocal.*" (*Id.* at pp. 454-455, italics added.) As the court further discussed, "[i]t is obviously impossible to be certain that a person will not lose his resolve to commit the crime until he completes the last act necessary for its accomplishment. But the law of attempts would be largely without function if it could not be invoked until the trigger was pulled, the blow struck, or the money seized. If it is not clear from a suspect's acts what he intends to do, an observer cannot reasonably conclude that a crime

72

will be committed; but *when the acts are such that any rational person would believe a crime is about to be consummated absent an intervening force*, the attempt is underway . . . ." (*Dillon,* at p. 455, italics added.)  " '[W]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.' (*People v. Anderson, supra,* 1 Cal.2d at p. 690 [attempted robbery]; see also *People v. Memro, supra,* 38 Cal.3d at p. 698 [attempted lewd conduct]; [*Dillon*], at p. 455 [attempted robbery]; *People v. Morales* (1992) 5 Cal.App.4th 917, 926 [attempted murder].)" (*Decker, supra,* 41 Cal.4th at p. 8.)

Lum argues that he took no act toward commission of grand theft and committed no "appreciable fragment" of the offense.  All he did, he maintains, was verbally accept the buyer's offer, which formed no binding contract; propose obtaining a locksmith who was in fact never hired; and offer to lower the selling price.  According to Lum, the proposed sale never "moved from words to action of any kind" and never reached a stage where money would have been paid absent some "fortuity or inadvertent force" preventing completion of the crime.

Lum's suggestion that the direct act necessary for an attempt had to be conduct rather than words is not persuasive.  "The 'direct' acts necessary to constitute an attempt to obtain property by false pretenses can be simply the making of misrepresentations calculated to induce the victim to part with his property. (*People v. Camodeca* (1959) 52 Cal.2d 142, 145.)" (*People v. Anderson* (1961) 55 Cal.2d 655, 661.)  Here, Lum responded to a letter from a real estate agent seeking a property for her client by offering to sell one of the units for "whatever price would sell it quickly."  When Alden communicated the client's offer of $1.2 million, Lum immediately accepted verbally.  When the agent asked about seeing the property, Lum said he did not have a key but would "figure something out," then in a subsequent call suggested meeting with a locksmith to gain access because he did not have the keys.  Lum also offered to lower the price if the buyer would provide an immediate "big side payment" in cash, outside of escrow.  This evidence demonstrates that Lum was actively engaged in negotiations to sell the unit, doing what he could to move the process forward as quickly as possible.

73

Although no binding contract was formed, Lum demonstrated a clear intent to enter a contract for sale of the unit.  The evidence clearly showed an overall plan to obtain money by fraudulently selling the property; Lum's acceptance of the verbal offer and attempts to facilitate the sale were "direct movement[s] toward commission" showing that Lum was "putting his . . . plan into action."  (*Decker, supra,* 41 Cal.4th at p. 8.)

Lum is correct, however, that the section 12022.6, subdivision (a)(2), enhancement in connection with his conviction of attempted grand theft cannot stand.  The jury found true the allegation that "in the commission" of the offense, Lum "took, damaged, or destroyed property of a value exceeding $200,000" belonging to John Abd-El-Malek.  But the evidence was clear that Abd-El-Malek suffered no loss.  Respondent concedes the enhancement does not apply.

### DISPOSITION

The section 12022.6, subdivision (a)(2), enhancements on counts 12 and 13 are stricken.  Shah's sentence shall be reduced by 16 months.

The sentence imposed under the section 12022.6, subdivision (a)(2), for count 11 is stayed pursuant to section 654.

The section 12022.6, subdivision (a)(2), enhancement on count 14 is stricken. Lum's sentence shall be reduced by eight months.

In all other respects, the judgment is affirmed.


_____
Kline, P.J.


We concur:


_____
Richman, J.


_____
Stewart, J.


74